# FOR PUBLICATION



FILED
Nov 13 2013, 7:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOEL C. WIENEKE**
Wieneke Law Office, LLC.
Plainfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DAVID WILLIAMS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 67A01-1302-CR-87 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PUTNAM CIRCUIT COURT
The Honorable Matthew L. Headley, Judge
Cause No. 67C01-1201-FA-29

**November 13, 2013**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

David Williams ("Williams") was convicted in Putnam Circuit court of eight counts of Class A felony child molesting and one count of Class B felony incest and was sentenced to an aggregate term of ninety-nine years. Williams appeals and presents four issues, which we restate as:

I. Whether the trial court abused its discretion in admitting into evidence Williams's statement to the police;

II. Whether Williams's convictions for child molesting and incest constitute double jeopardy;

III. Whether the trial court abused its discretion in sentencing Williams; and

IV. Whether Williams's sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

**Facts and Procedural History**

Williams and his ex-girlfriend, A.B., had an eight-year relationship which ended in 2008. The two had a daughter, K.W., who was born in 2003. After Williams's and A.B.'s relationship ended, K.W. would spend one week at her mother's house and the next week at her father's house. This arrangement lasted from 2009 until January 2012. During the time K.W. was at Williams's house, he repeatedly molested her. Williams would wait until everyone else in the house was asleep, then have K.W. sneak out of her room so that he could fondle her, perform oral sex on her, and have sexual intercourse with her. Williams told K.W. not to tell anyone what he was doing or else she would not be able to see him again.

Eventually, in January 2012, K.W. told her mother that she had a secret. When asked what this secret was, K.W. stated that Williams had put his "thingy" inside her.

2

A.B. contacted the authorities, and K.W. was interviewed at a child advocacy center. During the interview, K.W. stated, "we've got to stop it before [Williams] does it to [E.B.]," who was Williams's younger daughter with his current wife. Tr. p. 414. K.W. stated in more detail how Williams would molest her: Williams told her to wait until everyone was asleep and then sneak downstairs; then Williams would rub her genitalia, and force his penis into her vagina and have intercourse with K.W., often until ejaculation. If K.W. tried to resist, Williams would "jerk [K.W.] back." Tr. p. 407. Afterward, Williams would give K.W. an ice cream treat. K.W. also explained that this occurred as many as five nights a week every time she was at her father's house. Although there were brief periods where Williams would stop his molestations, K.W. explained, "then he would do it again. And again and again. He hasn't stopped." Tr. p. 393.

On January 25, 2012, the Indiana State Police ("ISP") executed a search warrant at Williams's home. They also asked Williams to go the police station for an interview. Williams agreed. On the way to the station, Williams sat in the front passenger seat of the police car and was not handcuffed. Still, the officer escorting Williams advised him of his Miranda rights. At the station, ISP Detective Jim Dungan ("Detective Dungan") and another officer interviewed Williams. Detective Dungan too advised Williams of his rights by reading from an advisement-of-rights form. Williams indicated that he understood the standard Miranda rights, i.e., that he had the right to remain silent, that anything he said could be used against him, that he had a right to have an attorney present during questioning, that an attorney would be appointed for him if he could not afford

one, and that he had the right to stop the questioning at any time. Tr. pp. 525-27. As Detective Dungan read these rights to Williams, he placed a check mark next to each right as Williams indicated that he understood that right.

Detective Dungan then asked Williams to read the waiver portion of the advisement form, which resulted in the following exchange:

Williams: I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure,

Dungan: Coercion.

Williams: Coercion?

Dungan: Do you know what that means?

Williams: No I don't.

Dungan: Kind of coercion, you are being coerced into saying something. We are promising you things or pressuring you into saying things[.] [A]nd you are talking on your own free will basically. Okay?

Williams: All right.

Tr. p. 527.

Williams stated, "I don't know like what or who is accusing me of stuff or anything," and further stated, "I don't know anything about lawyers. I've never had on[e] in my life. So I don't know about [what] I should do to be safe for myself." Id. at 528. The exchange then continued:

Dungan: Well I understand.

Williams: I mean I haven't even talked to my wife.

Dungan: The way we operate is, the way we kind of operate is there are two sides to every story. Okay, there's one side that

4

somebody tells me and there is another side. We have heard, we got one side,

Williams: Right.

Dungan: of the story.

Williams: And I don't even know what that story is.

Dungan: And that's . . . what we want to hear from you.

Williams: Okay.

Dungan: That's the reason we are talking to you. We want to hear [y]our side of what's going on.

Williams: Okay.

Dungan: And that's basically it.

Williams: All right. Okay. Um, well if you're just wanting to hear my side then I guess I don't need a lawyer or anything I mean.

Dungan: Okay but we, this form here is just a standard form that everybody. [sic] I'm sure you've seen on CSI and on TV and everything.

Williams: Yeah.

Dungan: It's just your rights. We have to read your rights to you.

Williams: Right.

Dungan: And so we just need you to sign right there basically saying that you are willing to . . . sit there and talk to us.

Williams: Yeah. Yeah. I'll say that.

Dungan: Yeah.

Williams: <u>Yeah, you guys are not forcing me.</u> You've, you've got to bear with me. I just,

Dungan: Oh yeah. I completely understand. If anytime during this you have a question for either one of us, feel free to ask.

Williams: Al[l] right.

Tr. pp. 528-30 (emphasis added).

As the questioning continued, Williams stated, "I'm just concerned that I, I don't know what I'm supposed to do. I've never been in . . . anything like this. I don't

5

know . . . if I should have a lawyer present or what." Tr. p. 538. Further yet into the interview, Williams stated:

> I'm sorry, I mean, I don't have a lawyer here or anything but I don't think it even matters. You guys seem like really nice guys. Uh, I just see it, I mean don't matter what I say or tell you guy[s], my life is over. I know what happens next. You know . . . I know if I go to prison they will beat me to death. I mean I'm not as . . . I'm not a mean guy and I'm terrified. I don't want to be near harden[ed] criminals and I don't even want my parents to go through this.

Tr. pp. 539-40 (emphasis added).

As Williams confessed to molesting his daughter, he asked, "Without a lawyer present here I'm just talking to you and all this stuff is going to be worse for me? The same? I've never been through anything like this." Tr. p. 550. Detective Dungan answered, "That . . . I can't answer. You are looking in a crystal ball and I don't have one." Id. Detective Dungan also told Williams, "And we can't for one, I don't do promises," "We can't make you [a] promise. Just like we can't threaten you." Tr. pp. 550-51. To this, Williams stated, "Well I don't [know] the point in having a lawyer here. It's just here and we are talking. Being honest. . . . But I am, like I said I am totally concerned and I'm not going to say it again[.] My life's over man." Tr. p. 551. Williams then continued to detail his sexual molestation of his daughter, even telling the police, "I'm going to tell you it's the same as what [K.W.] told you. I'm sure she wouldn't lie." Tr. p. 576. After his confession was over, Williams stated that he did not "like what I did at all," and explained that:

> that's why I didn't say, oh yeah, get me a lawyer in here and all that. [Be]cause I don't even understand all that stuff anyway because I have dealt with this stuff. So I didn't want to have a lawyer here to try to get me

6

out of something.  What's done is done and I just want to do, you know get it out there and really just disappear would be the best thing from me[.]

Tr. p. 649.  When Williams telephoned his wife, she indicated that she was looking for a lawyer for Williams.  Williams responded by telling her her, "there's not much need to get a lawyer . . . .  Because I screwed up.  I did it. . . .  I done [sic] inappropriate things to her."  Tr. pp. 655-56.

On January 27, 2012, the State charged Williams with nine counts of Class A felony child molesting, one count of Class B felony incest, and three counts of Class C felony child molesting.  On October 31, 2012, Williams filed a motion to suppress his confession to the police.  The trial court held a hearing on this motion on November 11, 2012, and denied the motion on November 30, 2012.  A three-day jury trial began on December 14, 2012.  At the conclusion of trial, the jury found Williams guilty of all counts save one count of Class A felony child molesting.  The trial court held a sentencing hearing on January 31, 2012, at which it merged the three Class B felony child molesting convictions with three of the Class A felony convictions.  The trial court then sentenced Williams to an aggregate term of ninety-nine years, with ninety years executed and nine years suspended.  Williams now appeals.

## I. Admission of Confession

Williams first claims that his confession to the police should not have been admitted because it was, he claims, coerced.  Questions regarding the admission of evidence are within the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion.  A trial court abuses its discretion only if its

7

decision is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. Wells v. State, 904 N.E.2d 265, 269 (Ind. Ct. App. 2009), trans. denied. With regard to the admission of a defendant's statement, it is the State's burden to prove by a preponderance of the evidence that a defendant's statement was voluntary. Id. (citing Pruitt v. State, 834 N.E.2d 90, 114 (Ind. 2005)).[1]

In evaluating a claim that a statement was not given voluntarily, the trial court is to consider the totality of the circumstances, including the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health. Id. at 271. On review, we look to the totality of the circumstances surrounding the waiver or confession, and our focus is whether the waiver or confession was free and voluntary and not induced by any violence, threats, promises, or other improper influences. Atteberry v. State, 911 N.E.2d 601, 606 (Ind. Ct. App. 2009) (citing Jackson v. State, 735 N.E.2d 1146, 1153 (Ind. 2000)). Of course, on appeal, we will not reweigh the evidence but instead, we view the evidence most favorable to the State, together with the reasonable inferences that can be drawn therefrom, in order to determine if there is substantial, probative evidence of voluntariness. Id. If there is substantial evidence to support the trial court's conclusion, we will affirm the trial court's decision. Id.

---

[1] Our supreme court has held that the Indiana Constitution requires the State to prove beyond a reasonable doubt that the defendant voluntarily waived his rights and that his confession was voluntarily given. Id. at 271 n.2 (citing Pruitt, 834 N.E.2d at 114-15). Williams does not develop a separate argument based on the Indiana Constitution, and we therefore only address his argument under the federal Constitution. See id. Furthermore, the State presented evidence that met even this more stringent standard.

Williams claims that the police coerced him into giving a statement and claims that he did not really understand what it meant to have a lawyer. He also claims that the police misled him into believing that his statements would not be used against him and that the police were there simply to help him. We disagree.

The police read Williams his Miranda rights twice: first when in the car on the way to the police station and again immediately before the interrogation began. Detective Dungan went over each of Williams's rights and Williams signed the waiver-of-rights form. It is true that Williams seemed not to understand the meaning of the word "coerce." But it is clear that Williams understood that the police could not force him to speak. Indeed, Williams even said to the police during the interrogation, "you guys are not forcing me." Tr. p. 530. Williams notes that he had only a ninth grade education and never obtained his GED. Although Williams claims that, because he had no prior criminal history, he did not understand what it meant "to have a lawyer," this is not a technical or difficult-to-comprehend term.[2] It is clear that the police twice informed Williams of his right to have an attorney present during questioning. And there is evidence that Williams understood this right; indeed, he stated that he did not need a lawyer to "try to get me out of something." Tr. p. 649.

Nor does the record support Williams's claim that the police misled him into thinking that his statement would not be used against him. Again, the police twice informed Williams of his Miranda rights, which plainly stated that what Williams said

---

[2] We also note that, during sentencing, Williams himself presented evidence of his psychological evaluation, which noted that Williams was of average intelligence and had the ability to read and comprehend what was presented to him.

9

could be used against him in court. And the police officers' statements that they wished to "help" Williams and his daughter were not implied promises of leniency. In context, the references to "help" appear to refer to Williams's need of help for his pedophilia, not help in the sense of lenience.

Our supreme court has long held that vague statements that the defendant benefits by cooperating and telling the truth do not constitute "promises" sufficient to render a statement involuntary. Giles v. State, 760 N.E.2d 248, 250 (Ind. Ct. App. 2002) (citing Fields v. State, 679 N.E.2d 1315, 1320 (Ind. 1997)). Moreover, here the detectives explicitly told Williams that they could *not* promise him anything.[3] Under these facts and circumstances, the trial court did not abuse its discretion in concluding that Williams's statement was voluntary, not coerced, and therefore admissible.

## II. Double Jeopardy

Williams next contends that his convictions for incest and child molesting constitute impermissible double jeopardy. Our supreme court recently summarized the law on double jeopardy in Indiana:

> [Article 1, Section 14 of the] Indiana Constitution . . . provides "[n]o person shall be put in jeopardy twice for the same offense." In Richardson v. State, 717 N.E.2d 32 (Ind. 1999), this Court concluded that two or more offenses are the same offense in violation of article 1, section 14 if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to obtain convictions, the essential elements of one challenged offense also establish the essential elements of another challenged offense. Under the actual evidence test, we examine the actual evidence presented at trial in order to determine whether each challenged

---

[3] We agree with the State that the police statement that "that's not going to happen," was a reply to Williams's fear that he would be "beat to death in front of my family," and not a specific promise of protection. Tr. p. 544.

10

offense was established by separate and distinct facts. Id. at 53. To find a double jeopardy violation under this test, we must conclude that there is "a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." Id. The actual evidence test is applied to all the elements of both offenses. "In other words . . . the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." Spivey v. State, 761 N.E.2d 831, 833 (Ind. 2002).

Our precedents "instruct that a 'reasonable possibility' that the jury used the same facts to reach two convictions requires substantially more than a logical possibility." Lee v. State, 892 N.E.2d 1231, 1236 (Ind. 2008) (citing cases). The reasonable possibility standard "fairly implements the protections of the Indiana Double Jeopardy Clause and also permits convictions for multiple offenses committed in a protracted criminal episode when the case is prosecuted in a manner that insures that multiple guilty verdicts are not based on the same evidentiary facts." Richardson, 717 N.E.2d at 53 n.46. The existence of a "'reasonable possibility' turns on a practical assessment of whether the [fact finder] may have latched on to exactly the same facts for both convictions." Lee, 892 N.E.2d at 1236. We evaluate the evidence from the jury's perspective and may consider the charging information, jury instructions, and arguments of counsel. Id. at 1234.

Garrett v. State, 992 N.E.2d 710, 719-20 (Ind. 2013).

Williams was convicted of incest based on evidence that he had sexual intercourse with his daughter during the period between January 1, 2010 and January 19, 2012. He was also convicted of Class A felony child molesting based on evidence that he had sexual intercourse with his daughter during the period between January 1, 2010 and January 20, 2012. Williams notes that, at trial, the State did not introduce any separate evidence to distinguish its proof of child molesting from its proof of incest. Nor did the State identify any separate acts of intercourse to support the incest conviction. Williams

11

therefore claims that there was a reasonable possibility that the jury relied on the same evidence to convict him of both child molesting and incest.

In support of his claim, Williams relies on Schaefer v. State, 750 N.E.2d 787 (Ind. Ct. App. 2001). In that case, the defendant was charged with and convicted of both child molesting and incest based upon his acts of molesting his daughter, which occurred between February 1, 1996 and May 27, 1996, when the defendant had custody of his daughter. Both charges alleged that the defendant performed or submitted to sexual intercourse or deviate sexual conduct with his daughter during the period he had custody of her. On appeal, this court held that it was "extremely likely that the jury used the same evidentiary facts to establish the essential elements of both child molesting and incest." Id. at 795.

We think, however, that Schaefer is distinguishable on its facts. In that case, the court noted that "the molestation" occurred from February to May of 1996. Id. at 791. It is therefore unclear from the discussion in that case whether there was any evidence of multiple or repeated acts of molestation by the defendant. But based on the court's conclusion that it was "extremely likely" that the same evidence was used to support both convictions, it is unlikely that there were numerous, repeated acts of sexual intercourse and/or deviate sexual conduct.

Here, however, the State did present evidence of numerous, repeated acts of molestation that took place over a period of years, up to five times per week when K.W. was with her father. If the jury credited K.W.'s testimony, which it obviously did, then there were numerous acts of sexual intercourse, any one of which could support a

12

conviction for incest or child molesting. Given these numerous instances of child molesting, we do not think that there was a reasonable possibility that the jury used the same instance of sexual intercourse to support Williams's conviction for incest and his convictions for Class A felony child molesting.

### III. Sentencing Discretion

Williams also claims that the trial court abused its discretion in sentencing him. At the sentencing hearing, Williams proffered as mitigating that he had no prior criminal history, that he was a good candidate for therapeutic intervention, and that the crime was unlikely to reoccur. The State asked the trial court to impose an aggregate sentence of ninety years, with ten suspended to probation. The trial court found as aggravating K.W.'s young age, the repeated nature of Williams's molestation, and that he was at a high risk to reoffend based upon his score on the Indiana Risk Assessment System ("IRAS").

The trial court grouped Williams's convictions based upon the period in which they were committed: on the first group, consisting of Counts I, II, and III, the trial court imposed concurrent sentences of thirty-three years with three years suspended to probation; on the second group, consisting of Counts IV, V, and VI, the trial court imposed concurrent sentences of thirty-three years with three years suspended to probation; and on the third group, consisting of Counts VII and IX, the trial court also imposed concurrent sentences of thirty-three years with three years suspended to probation. The trial court ordered the sentences on each of these groups of concurrent sentences to be served consecutively. The trial court also imposed a ten-year sentence on

Count X and ordered it to be served concurrent with the other sentences.[4] Thus, the trial court sentenced Williams to an aggregate of ninety-nine years, with nine years thereof suspended.

Williams claims that the trial court abused its discretion by failing to find certain mitigating factors he claims were clearly supported by the record and by using the IRAS score as an aggravating factor. Sentencing decisions rest within the sound discretion of the trial court. Anglemyer v. State, 868 N.E.2d 482, 490 (Ind. 2007). So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. Id. An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. Id. at 491. A trial court may abuse its sentencing discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. Id. at 490-91.

First, Williams claims that the trial court improperly failed to consider his lack of criminal history as a mitigating factor. The finding of mitigating factors is not mandatory and rests within the discretion of the trial court, and the trial court is not required to accept the defendant's arguments as to what constitutes a mitigating factor. Flickner v.

---

[4] As noted above, the trial court "merged" the convictions on Counts XI, XII and XIII, which were the Class C felony child molesting convictions, into the convictions for Class A felony child molesting.

14

State, 908 N.E.2d 270, 273 (Ind. Ct. App. 2009). Further, the trial court is not required to give the same weight to proffered mitigating factors as the defendant does, nor is it obligated to explain why it did not find a factor to be significantly mitigating. Id.

Historically, the lack of a criminal history has been considered to be a mitigating factor. See, e.g., Powell v. State, 769 N.E.2d 1128, 1136 (Ind. 2002) (noting generally that the lack of criminal history should be given substantial mitigating weight, but that the lack of criminal history does not automatically outweigh any valid aggravating circumstances), abrogated on other grounds by Beattie v. State, 924 N.E.2d 643 (Ind. 2010). However, it appears that our supreme court has retreated from this position.

In Kimbrough v. State, 979 N.E.2d 625 (Ind. 2012), our supreme court granted transfer in a case this court had decided in a memorandum decision. In our decision in that case, the majority concluded, *sua sponte*, that the trial court had abused its sentencing discretion by failing to consider as a significant mitigating factor that the defendant had no prior criminal history. See id. at 629 (citing Kimbrough v. State, No. 45A04-1106-CR-328 (Ind. Ct. App. March 21, 2012)). On transfer, our supreme court concluded that the trial court did not overlook the defendant's lack of criminal history. Id. The court further wrote:

> Second, by describing Kimbrough's lack of criminal history as a "substantial mitigating factor," and remanding this case with instructions to impose a reduced sentence, the Court of Appeals majority implicitly suggested the trial court should have given greater weight to this factor. But Anglemyer makes clear that when imposing a sentence a trial court "no longer has any obligation to 'weigh' aggravating and mitigating factors against each other" and thus "a trial court can not now be said to have abused its discretion in failing to 'properly weigh' such factors." Anglemyer, 868 N.E.2d at 491. Here, the trial court did in fact weigh

15

> aggravating and mitigating factors giving more weight to three aggravators than the sole mitigator. And the trial court cannot be said to have abused its discretion in so doing. See id. Thus on this ground the trial court also did not abuse its discretion in imposing Kimbrough's sentence.

Id.

We understand this language to mean that a defendant's lack of criminal history can no longer be said to always be a *significant* mitigating factor. This is so because, under Anglemyer, trial courts have no duty to weigh aggravating and mitigating factors. To hold that a particular factor is always significant suggests that the trial court has an obligation to give certain weight to that factor. Yet Anglemyer clearly holds that a trial court cannot now be said to have abused its discretion in how it weighed the aggravating and mitigating factors. 868 N.E.2d at 491. Accordingly, the trial court did not err in failing to consider as mitigating Williams's lack of criminal history.

Williams also claims that the trial court abused its discretion by failing to consider as mitigating the fact that Williams was amenable to therapeutic counseling. He refers to a report by a forensic psychologist, which Williams filed with his sentencing memorandum, in which the psychologist was of the opinion that Williams was a good candidate for psychotherapeutic intervention. According to Williams, this recommendation, combined with the restrictions placed on sex offenders, means that he will be unlikely to reoffend.[5] The trial court did not have to credit this report or give it any mitigating value. Thus, we cannot say that this particular proffered mitigating factor was clearly supported by the record, yet overlooked by the trial court.

---

[5] This conclusion was also contradicted by other evidence, discussed below, that indicated that Williams had a high risk to reoffend.

Williams next contends that the trial court abused its discretion by considering William's IRAS score to be an aggravating factor. The trial court did not directly state that Williams's IRAS score was an aggravating factor; instead, it noted that his score "shows that [Williams] ha[s] a high risk to reoffend." Tr. p. 881. Evidence-based offender assessment scores are not to be considered aggravating or mitigating factors or determine the gross length of a sentence. Malenchik v. State, 928 N.E.2d 564, 575 (Ind. 2010). But such evaluations and their scores may be employed in formulating the manner in which a sentence is to be served. Id.

Thus, to the extent that the trial court may have relied on Williams's IRAS score as a separate aggravating factor, this was improper. See id. However, if the trial court has abused its discretion in sentencing a defendant, we need not remand for resentencing if we conclude that the sentence imposed is not inappropriate. Chappell v. State, 966 N.E.2d 124, 134 n.10 (Ind. Ct. App. 2012), trans. denied; Mendoza v. State, 869 N.E.2d 546, 556 (Ind. Ct. App. 2007), trans. denied; Felder v. State, 870 N.E.2d 554, 558 (Ind. Ct. App. 2007); see also Windhorst v. State, 868 N.E.2d 504, 507 (Ind. 2007) (noting that when trial court errs in sentencing defendant, court on appeal may exercise authority to review and revise sentence, instead of remanding for resentencing). As discussed below, we conclude that Williams's sentence is not inappropriate.

## IV. Appellate Rule 7(B)

Pursuant to Indiana Appellate Rule 7(B), we may revise a sentence otherwise authorized by statute if, "after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the

character of the offender." In our review of sentences under this rule, "we must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." Trainor v. State, 950 N.E.2d 352, 355 (Ind. Ct. App. 2011), trans. denied.

Although we have the power to review and revise sentences, the principal role of our review should be to attempt to level the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve what we perceive to be a "correct" result in each case. Fernbach v. State, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011), trans. denied (citing Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008)). Our review under Appellate Rule 7(B) should focus on "the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." Id. The appropriate question is not whether another sentence is more appropriate; rather, the question is whether the sentence imposed is inappropriate. Fonner v. State, 876 N.E.2d 340, 344 (Ind. Ct. App. 2007). And it is the defendant's burden on appeal to persuade us that the sentence imposed by the trial court is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

Williams was convicted of eight counts of Class A felony child molesting. The sentencing range for a Class A felony is twenty to fifty years, with the advisory sentence being thirty years. Ind. Code § 35-50-2-4. And the sentencing range for a Class B felony, such as William's incest conviction, is six to twenty years, with ten years being the

18

advisory sentence. Ind. Code § 35-50-2-5. Thus, the statutory maximum sentence for Williams would have been four hundred and twenty years. The trial court sentenced Williams to an aggregate of ninety years executed and nine years suspended.[6] As a credit-restricted felon, Williams will be required to serve at least eighty-five percent of his executed time. See Boling v. State, 982 N.E.2d 1055, 1058-59 (Ind. Ct. App. 2013). "[E]valuation of a defendant's sentence may include consideration of the defendant's credit time status because this penal consequence was within the contemplation of the trial court when it was determining the defendant's sentence." Sharp v. State, 970 N.E.2d 647, 651 (Ind. 2012). With this in mind, we consider whether the sentence imposed by the trial court was improper.

The nature of Williams's offenses is particularly heinous. He used his own young daughter, K.W., who was between the ages of seven and nine at the times of his crimes, to satisfy his deviate sexual desires. Over a period of years, he repeatedly had sexual intercourse with K.W., at times up to five times per week. If K.W. attempted to resist, Williams forced her to submit. He also bribed her to remain silent by giving her treats after he had molested her, and threatened her that he could not see her again if she told what had happened. There was ample evidence presented that Williams molested K.W.

---

[6] We find Williams's citation to Akard v. State, 937 N.E.2d 811 (Ind. 2010), to be unavailing. In that case, our supreme court noted that the sentence imposed by the trial court was the same as that requested by the State at trial and argued as appropriate by the State on appeal. Id. at 813. Williams notes that here, the State requested a sentence of only eighty years executed. But Akard does not stand for the proposition that the trial court is in any way bound to the sentence requested by the State. Instead, at issue in Akard was whether the court on appeal should *increase* the defendant's sentence under Appellate Rule 7(B). The Akard court concluded that "the State's request for no greater sentence at trial and its assertion on appeal that such is an appropriate sentence . . . [were] strong indicators that the trial court sentence is not inappropriately lenient." Id. at 814. Here, the question is not whether the trial court's sentence was inappropriately lenient, but whether it was inappropriately harsh. Akard is therefore inapposite.

19

dozens of times. The nature of Williams's offenses alone justify the trial court's sentencing decision.

And our consideration of Williams's character does not alter this conclusion. Although Williams had yet to be convicted of any crimes, for years he repeatedly had incestuous sexual intercourse with his young daughter. He abused one of, if not the, most sacred positions of trust—that of a parent to his or her child. In addition, there was evidence that Williams molested his daughter because she reminded him of her mother, Williams's ex-girlfriend. None of this speaks well for Williams's character.

In short, Williams has not persuaded us that his sentence of ninety years executed and nine suspended is inappropriate in light of the nature of the offense and the character of the offender. Therefore, even if the trial court had abused its discretion in sentencing Williams, there is no need to remand for resentencing. See Chappell, 966 N.E.2d at 134.

**Conclusion**

The trial court did not abuse its discretion in admitting Williams's statement to the police into evidence because his statement was not coerced. Williams's convictions for Class A felony child molesting and Class B felony incest do not constitute double jeopardy because there was no reasonable possibility that these convictions were based upon the same actual evidence. Lastly, even if the trial court did abuse its discretion in its consideration of certain aggravating factors in sentencing Williams, we need not remand for resentencing because the sentence imposed by the trial court is not inappropriate.

20

Affirmed.

NAJAM, J., and BROWN, J., concur.