## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 23 2019, 10:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alan K. Wilson
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lionel Ray Mackey, Jr., *Appellant-Defendant,* | May 23, 2019 |
| | Court of Appeals Case No. 18A-CR-2624 |
| v. | Appeal from the Delaware Circuit Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Linda Ralu Wolf, Judge |
| | Trial Court Cause No. 18C03-1701-F1-1 |

**Barteau, Senior Judge.**

# Statement of the Case

Lionel Ray Mackey, Jr., appeals his convictions of attempted murder, a Level 1 felony;[1] possession of a destructive device or explosive, a Level 2 felony;[2] intimidation, a Level 5 felony;[3] criminal recklessness, a Level 6 felony;[4] and conspiracy to commit perjury, a Level 6 felony.[5] He also appeals a portion of the 101-year aggregate sentence imposed by the trial court. We affirm in part, reverse in part, and remand with instructions.

# Issues

Mackey raises three issues, which we restate as:

    I.    Whether the trial court erred by admitting into evidence Mackey's incriminating statements to a police officer during post-arrest questioning.

    II.    Whether Mackey's convictions for attempted murder and possession of a destructive device or explosive violate his state constitutional protections against double jeopardy.

---

[1] Ind. Code §§ 35-42-1-1 (2014) (murder), 35-41-5-1 (2014) (attempt).

[2] Ind. Code § 35-47.5-5-8 (2014).

[3] Ind. Code § 35-45-2-1 (2014).

[4] Ind. Code § 35-42-2-2 (2014).

[5] Ind. Code §§ 35-44.1-2-1 (2014) (perjury), 35-41-5-2 (2014) (conspiracy).

> III. Whether the aggregate sentence for some of his convictions exceeds the statutory maximum for a single episode of criminal conduct.

In addition, we raise an additional issue on our own motion: whether Mackey's convictions for attempted murder and intimidation violate his state constitutional protections against double jeopardy.

## Facts and Procedural History

[3] Lionel Mackey and Margie Harvey[6] were in a relationship from late July 2016 until November 5, 2016, when Harvey ended their relationship due to Mackey's controlling manner. Mackey reacted poorly to the breakup and continued to contact Harvey despite her requests not to do so. On November 10, 2016, she obtained a protective order against him. Next, Mackey made threatening phone calls to Harvey, including a call in late November 2016 in which he said he would blow her up. In another recorded call from November 2016, he said she might get her throat slashed or be shot in the back while she was working.

[4] Tamara Olis began a romantic relationship with Mackey in November 2016 and moved in with him. On the night of December 28, 2016, Olis saw Mackey working on a wooden box at their residence. She also saw him working with

---

[6] Margie Harvey was formerly known as Margie Wolford. We refer to her using the name she provided at Mackey's second trial.

wires, batteries, and a light.  Olis went to sleep, and when she awoke to check her blood sugar, Mackey was gone.

[5] In the early morning hours of December 29, 2016, Harvey was at work, driving a taxi.  She stopped by her house shortly after 2 a.m.  Harvey shared the house with her seven-year-old daughter, her boyfriend, and her boyfriend's nine-year-old son.  Her boyfriend and his son were home at the time, sleeping.

[6] Upon arriving, Harvey saw a white trash bag on her porch, placed near her trash can.  She looked in the bag and saw a sealed while cardboard box bearing United States Postal Service logos.  The box had Harvey's address and was purportedly from her friend Daysha Sneed.

[7] Harvey did not enter her home because she had accidentally left her house key at the taxi company's office.  She instead put the box in her taxicab and went back to work.  At around 5 a.m., Harvey asked Sneed via text message if she had left a box on her porch.  Sneed denied sending her anything, stating that that she was in the hospital.  She suggested to Harvey that Mackey "sent something to ur [sic] house and put [it] from me."  Tr. Ex. Vol. 2, State's Ex. 6.

[8] Later, Harvey stopped at the taxi company's office and opened the box.  She found a smaller wooden box, surrounded by paper.  Harvey opened the lid of the wooden box slightly and saw what appeared to be wires or batteries.  She showed the box to the taxi company's dispatcher, who placed it on the ground outside the office and told her to return to work.  Harvey believed the dispatcher would call 911, but he did not.

[9]     Harvey saw the box again when she returned to the office. She called 911 and reported that she had received a bomb. Harvey told the 911 dispatcher that she believed Mackey had delivered the package and further explained she had an active protective order against him.

[10]    Officer Jonathon Thornton of the Muncie Police Department ("MPD") arrived at the scene at 7:30 a.m., followed by other officers. Harvey told officers she suspected Mackey had placed the package at her home. Officer Thornton opened the box slightly and saw PVC pipes, wiring, and batteries. He notified a supervisor. Next, the officers decided to evacuate all structures within a radius of several blocks and contacted the Delaware County Sheriff's Office's bomb disposal squad ("the squad").

[11]    The squad arrived and used a robot equipped with a camera to approach the wooden box, open it remotely, and examine the contents from a safe distance. The device appeared to be a potentially functional pipe bomb, with batteries, circuitry, and two sealed PVC pipes. It did not seem to be a hoax device.

[12]    The bomb appeared to have been constructed so that it would be triggered by a person opening the box's lid. The resulting blast could have caused death or serious bodily injury to that person. Captain George Sheridan of the Delaware County Sheriff's Department, who was the squad's leader, theorized that low overnight temperatures may have damaged the bomb and prevented it from functioning. The squad rendered the bomb safe through a controlled detonation process and collected its components as evidence.

[13]     Later that morning, officers with the MPD obtained a search warrant for Mackey's house. Several officers arrived at the house and took him into custody while the squad searched the house. They first sent a camera-equipped robot inside and, when the officers did not see anything apparently dangerous, then searched the house in person.

[14]     Officers searched Mackey's trash can and found black duct tape and wires that were consistent with materials used in the bomb. Inside the house, they found an epoxy mix that appeared to be consistent with epoxy that was used in the bomb. The officers also found eyelets that resembled the eyelets that were found on the bomb. In addition, they saw a table saw that had shavings that appeared to have come from a PVC pipe, and a test light device which can be used to test whether an electrical circuit is working. The officers also found model rocket engines. Finally, they found black electrical tape and black wire that was consistent with the packaging that was found in the trash, and an empty package of Duracell 9-volt batteries. The squad had found a Duracell brand 9-volt battery among the bomb's components.

[15]     On the afternoon of December 29, 2016, Investigator Brian Campbell questioned Mackey at the MPD's offices. During the hour-long interview, Mackey said, "I f*****g did it because I'm a f*****g nutball." State's Ex. 1, at 43:38. "I did it. I'm the f*****g bad guy." *Id.* at 48:16.

[16]     Police officers sent the bomb components and certain items found during the search of Mackey's house to the Federal Bureau of Alcohol, Tobacco,

Firearms, and Explosives ("ATF") for analysis. An ATF analyst confirmed that the device had been a complete, potentially functional pipe bomb. The PVC pipes had been filled with a type of gunpowder known as Hodgdon Pyrodex. Model rocket engines were placed in the bomb and should have ignited the explosion.

[17] Next, the analyst compared the components of the bomb with items found in Mackey's house. Epoxy found on the bomb was chemically consistent with epoxy found in the house. Black electrical tape found on the bomb was physically and chemically consistent with tape found in the house. A yellow wire found in Mackey's house was physically and chemically consistent with yellow wire that was found on the bomb. Finally, empty packaging for a brand of model rocket engines that was found in Mackey's home had contained a type of model rocket engine that was physically and chemically consistent with the model rocket engine that was found in the bomb.

[18] The ATF agents also performed DNA testing on swabs taken from the cardboard box and the bomb components. They compared the resulting DNA profiles with Mackey and Harvey's DNA profiles. Mackey's DNA profile was consistent with a profile of DNA that was found on the outside of the cardboard box. His DNA profile was also consistent with profiles of DNA that were found on multiple bomb components.

[19] Finally, ATF Agent Michael Eggleston, a specialist in explosives and incendiary devices, examined the bomb components. He determined that it

had been built with all of the necessary components to be a functioning explosive device. Agent Eggleston classified it as a victim-initiated improvised explosive device, meaning that an act by a victim was necessary to trigger the detonation. He noted several redundancies in the device, such as multiple PVC pipes and multiple nine-volt batteries, which indicated to him that the builder took extra steps to ensure that the device functioned as intended.

[20] On January 9, 2017, the State charged Mackey with attempted murder; possession of a destructive device or explosive; attempted aggravated battery, a Level 3 felony;[7] intimidation, a Level 5 felony; and criminal recklessness.[8] In addition, the State filed a notice of intent to seek an habitual offender sentencing enhancement.

[21] Mackey called Olis while he was incarcerated, and the call was recorded. Mackey instructed her to tell the police that she actually saw him with a DVD box instead of the wooden box on the night of December 28, and she had been mistaken about what she saw because she had low blood sugar at the time. As a result, the State later charged Mackey with conspiracy to commit perjury.

---

[7] Ind. Code §§ 35-42-2-1.5 (2014) (aggravated battery), 35-41-5-1.

[8] The State also charged Mackey with possessing, maintaining, or transporting a regulated explosive by a convicted felon, a Level 5 felony; stalking, a Level 5 felony; and two counts of invasion of privacy, both Class A misdemeanors enhanced to Level 6 felonies due to prior convictions of the same offense; but later dismissed those charges.

[22] On April 20, 2017, Mackey filed a motion to suppress statements that he made to Investigator Campbell. The State filed a response, and the trial court held a hearing, during which the court ordered the parties to submit briefs. The court received the briefs and subsequently denied Mackey's motion, concluding: "there is no evidence that the confession made by [Mackey] was involuntary." Appellant's App. Vol. 2, p. 232.

[23] A jury trial began on April 16, 2018. During trial, Mackey waived his right to a jury trial on the habitual offender enhancement. The jury determined Mackey was guilty of possession of a destructive device or explosive, attempted aggravated battery, intimidation, criminal recklessness, and conspiracy to commit perjury. The jury could not agree on a verdict as to attempted murder, and the court declared a mistrial as to that charge. Next, the court heard evidence on the habitual offender enhancement and determined the State had proven beyond a reasonable doubt that Mackey was an habitual offender.

[24] The State notified the Court and Mackey that it intended to retry him on the charge of attempted murder. Mackey objected and requested permission to pursue a discretionary interlocutory appeal. The court denied Mackey's request. Next, the retrial on the charge of attempted murder began on September 17, 2018. The jury determined Mackey was guilty of that charge.

[25] At sentencing, the trial court merged the charge of attempted aggravated battery into the charge of attempted murder and imposed the following sentences:

| Attempted murder plus habitual offender enhancement | Sixty years |
|---|---|
| Possession of a destructive device or explosive | Thirty years |
| Intimidation | Six years |
| Criminal recklessness | Two and one-half years |
| Conspiracy to commit perjury | Two and one-half years |

[26] The trial court ordered Mackey to serve each of his sentences consecutively, for an aggregate sentence of 101 years. This appeal followed.

# Discussion and Decision

## I. Incriminating Statements During Questioning

[27] Mackey argues the trial court should not have admitted into evidence a recording of his post-arrest statements to Investigator Campbell. In general, questions regarding the admission of evidence are within the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. *Williams v. State*, 997 N.E.2d 1154, 1160 (Ind. Ct. App. 2013). A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id.*

[28] When the defendant challenges the admissibility of an incriminating statement to police, the State must prove beyond a reasonable doubt that the statement was given voluntarily. *Luckhart v. State*, 736 N.E.2d 227, 229 (Ind. 2000). The

voluntariness of an incriminating statement is determined from the totality of the circumstances. *Id.* (quotation omitted). We consider the entire interrogation, not any single act by the police or condition of the suspect. *Id.* Relevant factors include the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health. *Williams*, 997 N.E.2d at 1160. We review the trial court's ruling, without reweighing the evidence, to determine if there was substantial evidence of probative value to support the ruling. *Garmon v. State*, 775 N.E.2d 1217, 1220 (Ind. Ct. App. 2002).

[29] Officers arrested Mackey on December 29, 2016, and took him to the police station, where they placed him in an interview room. Investigator Campbell began questioning Mackey around 3 p.m. The questioning was recorded by camera. Investigator Campbell began by reading Mackey a form explaining his Miranda rights. Mackey, who had graduated from high school, indicated he understood his rights. Next, Investigator Campbell handed Mackey the form, and he read it and signed it. Mackey later testified that he had understood his rights at the time of the interview.

[30] The interview lasted approximately an hour, during which Mackey made the incriminating statements discussed above. The interview ended when Mackey asked for an attorney.

[31] Mackey argues he did not validly consent to the interview because he was mentally ill and unable to understand the questions. During the interview, he

stated he had gone to a mental health evaluator earlier that morning for stress and bipolar disorder. Mackey further stated he had called his children the previous night, but their mother would not let him talk to them. He told Investigator Campbell, "I'm about ready to break." State's Ex. 1, at 42:28.[9] Toward the end of the interview, Mackey alternated between crying and raising his voice. In addition, Mackey later testified during the hearing on his motion to suppress that he had experienced suicidal ideations on the morning of December 29, 2016, and that he had been diagnosed with bipolar disorder, anxiety, and explosive temper disorder when he was fifteen or sixteen.

[32]     As is noted above, a defendant's mental health is one of the factors a court weighs when considering the voluntariness of a police interview. Nevertheless, "severe mental problems," standing alone, are not "sufficient to require the exclusion of a statement." *Hurt v. State*, 694 N.E.2d 1212, 1218 (Ind. Ct. App. 1998), *trans. denied*. In this case, Mackey admitted that he understood his Miranda rights. Although he was upset during the interview, he was alert and oriented to time and place. Mackey never expressed confusion or claimed not to understand Investigator Campbell's questions. Furthermore, he exercised his right to counsel, thus ending the interview. We conclude Mackey's claim of incapacity resulting from mental illness is a request to reweigh the evidence.

---

[9] The record on appeal contains two versions of the recording. State's Exhibit 1, the full recording, was admitted during the hearing on Mackey's motion to suppress. State's Exhibit 78, a redacted version of the recording, was admitted into evidence at trial. We will refer to State's Exhibit 1 in our analysis.

[33]    Next, Mackey argues Investigator Campbell engaged in deception during the interview because the investigator told him, "we have little doubt that you did it." State's Ex. 1, at 31:50. We disagree with Mackey's argument that Investigator Campbell lied. To the contrary, the investigator supported his statement of opinion by discussing the evidence. He told Mackey, "We've talked with [Olis]." *Id.* at 34:35 Investigator Campbell further said during the interview, "I know you did it, we've searched your house, we saw what you put in the trash can" *Id.* at 36:41. He also said, "We've talked to a lot of people, man." *Id.* at 36:38.

[34]    Instead of lying, Investigator Campbell presented his view of the case, supported by assessments of the evidence. Further, he never shouted at Mackey. Mackey later conceded that he "wasn't threatened" by Campbell and that there was no "police misconduct." Tr. Vol. II, pp. 11, 15. Under the totality of the circumstances, the trial court did not err in concluding Mackey voluntarily waived his Miranda rights and made incriminating statements of his own free will. The court did not abuse its discretion in admitting the recording of Mackey's incriminating statements. *See Harrington v. State*, 755 N.E.2d 1176, 1182 (Ind. Ct. App. 2001) (defendant's incriminating statements were voluntary; the officers did not engage in deception and were unaware of defendant's cognitive impairments because he appeared to be of average intelligence and understood their questions).

# II. Double Jeopardy

[35] Mackey claims his convictions of Level 1 felony attempted murder and Level 2 felony possession of a destructive device or explosive violate his protections against double jeopardy under article I, section 14 of the Indiana Constitution.[10] He is not presenting a claim under the Double Jeopardy Clause of the United States Constitution.

[36] Section 14 was intended "to prevent the State from being able to proceed against a person twice for the same criminal transgression." *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999). The Indiana Supreme Court has explained that two or more offenses violate section 14 "if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Id.* (emphasis omitted).

[37] Mackey argues his convictions for attempted murder and for possession of a destructive device or explosive violate both the statutory elements test and the actual evidence test. Turning to the statutory elements test, the objective "is to determine whether the essential elements of separate statutory crimes charged could be established hypothetically." *Id.* at 50. Courts must compare "the essential statutory elements of one charged offense with the essential statutory elements of the other charged offense," along with the charging instrument. *Id.*

---

[10] Section 14 provides, in relevant part: "No person shall be put in jeopardy twice for the same offense."

"Each offense must contain at least one element which is separate and distinct from the other offense so that the same evidence is not necessary to convict for both offenses." *Id.* at 52.

[38] The elements of attempted murder, as charged in this case, are as follows: (1) Mackey (2) with the specific intent to kill Harvey (3) engaged in conduct that constituted a substantial step (4) toward killing Harvey (5) by means of constructing and/or delivering a destructive device or explosive to her home. Ind. Code §§ 35-42-1-1; 35-41-5-1; Appellant's App. Vol. 2, p. 3. The elements of possession of a destructive device or explosive, as charged in this case, are as follows: (1) Mackey (2) possessed, transported, received, or placed (3) a destructive device or explosive (4) with the knowledge or intent (5) that it would be used to kill, injure or intimidate an individual or to destroy property. Ind. Code § 35-47.5-5-8, Appellant's App. Vol. 2, p. 4.

[39] A comparison of the two offenses reveals that they contain different elements. The attempted murder charge requires proof of a specific intent to kill Harvey, but the charge of possession of a destructive device or explosive does not require proof of intent to kill anyone. Intent to destroy property could instead suffice. Furthermore, the charge of attempted murder requires construction and/or delivery of a destructive device or explosive, but proof of mere possession or transportation of a destructive device or explosive would establish the second charge. We conclude the two offenses do not violate the statutory elements portion of the *Richardson* double jeopardy analysis. *See Thy Ho v. State*, 725 N.E.2d 988, 992 (Ind. Ct. App. 2000) (charges of armed robbery and theft

did not violate statutory elements test; the offenses as charged involved different victims and different types of property).

[40] When the statutory elements test does not disclose a double jeopardy violation, we turn to the second part of the *Richardson* analysis, the actual elements test. 717 N.E.2d at 52. As our Supreme Court stated:

> Under this inquiry, the actual evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. To show that two challenged offenses constitute the 'same offense' in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.

*Id.* at 53. Courts must "evaluate the evidence from the jury's perspective, considering where relevant the jury instructions, argument of counsel, and other factors that may have guided the jury's determination." *Spivey v. State*, 761 N.E.2d 831, 832 (Ind. 2002).

[41] Mackey argues, "it is almost inconceivable that the jury" would have relied on different evidence to sustain the two charges. Appellant's Br. p. 20. We disagree. The jury was instructed that Mackey was accused of committing the two offenses "on or about December 29, 2016." Appellant's App. Vol. 4, p. 6. The State presented evidence that Harvey discovered the explosive device on her porch very early in the morning on December 29, 2016, which pertained to the charge of attempted murder. By contrast, the State also presented evidence

that Mackey's then-girlfriend, Olis, had seen Mackey handling the explosive device late on the night of December 28, 2016, which pertained to the charge of possession of a destructive device or explosive. During closing arguments, the State pointed to Olis' testimony as proof that Mackey had possessed the destructive device or explosive.

[42] If the only evidence of Mackey's possession of a destructive device or explosive had been his placement of the device on Harvey's porch, then his claim under the "same evidence" test may have prevailed. *See, e.g.*, *Wilson v. State*, 611 N.E.2d 160, 166 (Ind. Ct. App. 1993) (convictions for attempted murder and possession of an explosion violated double jeopardy protections; the same evidence (defendant's act of attaching a bomb to victim's car) supported both convictions), *trans. denied*. In the current case, the State presented separate and distinct evidence for the offenses of attempted murder and possession of a destructive device or explosive. Under these facts and circumstances, Mackey has not demonstrated a reasonable possibility that the jury could have used the same evidence to support both convictions. His convictions of attempted murder and possession of a destructive device or explosive do not violate his double jeopardy protections under the Indiana Constitution.

[43] We reach a different conclusion with respect to Mackey's convictions of attempted murder and Level 5 felony intimidation. Mackey did not object to these convictions on double jeopardy grounds at trial, but we may raise double jeopardy claims on appeal because "questions of double jeopardy implicate

fundamental rights." *Whitham v. State*, 49 N.E.3d 162, 168 (Ind. Ct. App. 2015), *trans. denied*.

[44] The jury was instructed that Mackey was accused of committing the two offenses "on or about December 29, 2016." Appellant's App. Vol. 4, pp. 6-7. The State presented evidence that Harvey discovered the explosive device on her porch very early in the morning on December 29, 2016, which pertained to the charge of attempted murder. But the State presented no evidence of any act of intimidation by Mackey (that is, communication of a threat) on or about that date except for the placement of the explosive device on her porch. At trial, the State argued to the jury that Mackey's threatening calls to Harvey supported the intimidation charge, but he made those calls a month before the explosive device incident. Stretching the phrase "on or about" to include acts a month prior to the specified date does not comport with standards of notice pleading.

[45] Following the holding in *Wilson*, we conclude there is a reasonable possibility that the jury cited the same evidence (Mackey's delivery of an explosive device to Harvey's house) to establish the elements of attempted murder and intimidation. We reverse Mackey's conviction of intimidation and remand with instructions to vacate that conviction on double jeopardy grounds.

## III. Sentencing

[46] Mackey claims the aggregate sentence for his convictions of possession of a destructive device or explosive and criminal recklessness are erroneous because

the sentence exceeds the statutory limit for an episode of criminal conduct.[11] An appellate claim of sentencing error is subject to review for an abuse of discretion. *Reynolds v. State*, 657 N.E.2d 438, 440 (Ind. Ct. App. 1995). A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Williams*, 997 N.E.2d at 1160.

[47] Indiana Code section 35-50-1-2 (2016) governs consecutive sentences involving episodes of criminal conduct. The statute distinguishes between crimes of violence and other crimes. For purposes of Section 35-50-1-2, the offenses of possession of a destructive device or explosive and criminal recklessness are not considered crimes of violence. The statute further states:

> The court may order terms of imprisonment to be served consecutively even if the sentences are not imposed at the same time. However, except for crimes of violence, the total of the consecutive terms of imprisonment, exclusive of terms of imprisonment under IC 35–50–2–8 and IC 35–50–2–10 (before its repeal) to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct shall not exceed the period described in subsection (d).

---

[11] Mackey also argues that his sentence for intimidation is part of the same episode of criminal conduct, but we have reversed that conviction and sentence on double jeopardy grounds and need not address it further. Mackey does not claim that the trial court erred in ordering him to serve his sentences for attempted murder and conspiracy to commit perjury consecutively to each other and to the other sentences.

The parties agree that, pursuant to subsection (d) of the statute and the facts of this case, Mackey's maximum sentence for a single episode of criminal conduct for nonviolent felonies may not exceed thirty-two years.

[48] Mackey argues his convictions for possession of a destructive device or explosive and criminal recklessness arose out of a single episode of criminal conduct. He thus concludes that his aggregate sentence for those convictions, thirty-two and a half years, exceeds the thirty-two-year statutory limit.

[49] The State concedes that Mackey's convictions for possession of a destructive device or explosive and criminal recklessness arose from a single episode of criminal conduct. The State further concedes that Mackey's aggregate sentence for those two convictions, thirty-two-and one-half years, exceeds the statutory limit by six months and must be corrected. In light of the State's concessions, we conclude that Mackey's aggregate sentence for possession of a destructive device or explosive and criminal recklessness exceeds the statutory limit and must be reduced by six months. We remand for resentencing within the statutory limit. *See Dimmitt v. State*, 25 N.E.3d 203, 210 (Ind. Ct. App. 2015) (remanding for resentencing with instructions; State had conceded in the trial court that offenses were part of a single episode of criminal conduct), *trans. denied*.

# Conclusion

[50] For the reasons stated above, we affirm the judgment of the trial court in part, reverse in part, and remand with instructions.

Affirmed in part, reversed in part, and remanded with instructions.

Kirsch, J., and Altice, J., concur.