**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Lee v. Cardington,* **Slip Opinion No. 2014-Ohio-5458.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-5458

LEE, APPELLEE, *v.* VILLAGE OF CARDINGTON, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Lee v. Cardington,* Slip Opinion No. 2014-Ohio-5458.]**

*Employment relations—R.C. 4113.52—Whistleblower protection—Reporting of employer's criminal violations—Standards that must be met to qualify for protection.*

(No. 2013-1400—Submitted July 8, 2014—Decided December 17, 2014.)

APPEAL from the Court of Appeals for Morrow County,

No. 12CA0017, 2013-Ohio-3108.

_____

**FRENCH, J**.

**{¶ 1}**  This case concerns R.C. 4113.52, Ohio's "whistleblower" statute, which protects employees from discipline if they discover and report certain violations during the course of their employment.  Appellee, Donald Lee, was instrumental in exposing crimes related to an automotive-parts manufacturer's discharge of hazardous chemicals into the public water supply.  The question before us, however, is whether he also exposed crimes involving his *own*

employer—appellant, the village of Cardington—so as to qualify as a whistleblower under either R.C. 4113.52(A)(1) or (2). We hold that he did not.

**Background**

**{¶ 2}** For purposes of this appeal, which is before us pursuant to the trial court's granting of a motion for summary judgment, we consider Lee's version of the relevant facts, as follows.

**{¶ 3}** Lee worked as the "crew chief" for the village from 2000 to 2009. His duties included supervising the operation of the village's wastewater treatment plant ("WWTP"). This appeal arises from Lee's discovery that someone was discharging a hazardous chemical that was passing through the WWTP into the water supply. The WWTP could not effectively handle or treat the discharge and the chemical ultimately caused more than $750,000 in damages to the WWTP. That someone—according to the ensuing state and federal investigation—turned out to be Cardington Yutaka Technologies, Inc. ("CYT"), an automotive-parts manufacturer and the village's largest employer.

**{¶ 4}** Starting in 2000, Lee began to notice equipment disruptions that occurred around the time that CYT conducted biannual shutdowns of its manufacturing plant. The WWTP uses bacteria to digest the solids contained in the wastewater it treats, and the bacteria were dying. According to Lee, this caused a significant accumulation of foam, so much that foam would spill over the WWTP walls and into the yard. Lee notified the local representative of the Ohio Environmental Protection Agency ("Ohio EPA") of his concerns.

**{¶ 5}** The biannual problems worsened by the spring of 2007. Lee noticed the increased problems at his farm, where Ohio EPA permitted him to use sludge treated by the WWTP as fertilizer that he spread on his fields. After noticing that the treated sludge was preventing plant growth, Lee asked Ohio EPA to investigate the source of the unknown pollutant and stopped using the sludge.

{¶ 6} Ohio EPA began to rule out potential sources of contamination, including the WWTP itself. After a two-day inspection in 2007, Ohio EPA determined that the WWTP was not the source of the pollutant and was satisfying the conditions of its operating permit.

{¶ 7} By the end of 2007, the investigation centered on CYT's manufacturing plant. When CYT officials consistently denied the discharge, Ohio EPA obtained the assistance of the United States Environment Protection Agency's ("U.S. EPA") criminal division. U.S. EPA also ruled out the WWTP as the source of the pollutant and CYT was ultimately determined to be responsible. Testing eventually revealed that the pollutant was glycol, an industrial chemical used by CYT.

{¶ 8} A main area of Lee's focus was repairing the damage to the WWTP. In 2007 and 2008, Lee continuously discussed the problems with his supervisor, Dan Ralley, the village administrator. Lee was concerned that because the WWTP was not filtering out the pollutant discharged by CYT, the glycol was passing through to Whetstone Creek, a source of drinking water for water plants downstream from the village. He also voiced his concerns that the glycol had damaged some of the WWTP's equipment and that if left uncorrected, the damage would cause the plant to exceed the discharge limitations of its permit.

{¶ 9} Lee and Ralley clashed over how to fix the equipment problems. According to Lee, Ralley was uncooperative and resisted Lee's attempts to fully notify him of the problems. Although Ralley was seeking restitution from CYT and was considering a proposal from an outside engineering firm, Lee claimed that Ralley was overly dismissive of Lee's own proposal to repair the problems. Lee believed that his proposal was more effective and less costly than the alternative.

{¶ 10} Lee voiced his concerns about the WWTP to the village council at two meetings in September and December 2008. At the September meeting, Lee stated that "something" was causing equipment problems in the WWTP and causing the WWTP to send toxic water downstream. He told the council that the WWTP had not yet violated its operating permit, but that the failure to repair the equipment would lead to a permit violation in the future. In December 2008, Lee attended a village council committee work session with Ralley. Lee told the council that the plant was still in compliance with its permit, but that "someone should pay" for the resulting damage.

{¶ 11} In June 2009, the village terminated Lee for reasons disputed by the parties. Lee alleges a retaliatory motive, but the village cites alleged incidents of insubordination, failure to complete jobs, personal use of village property, and taking time off without notice.

{¶ 12} Lee sued the village in October 2009, claiming that the village fired him in violation of Ohio's whistleblower statute, R.C. 4113.52, and in violation of public policy. In support of his statutory whistleblower claim, Lee alleged that the village retaliated against him for "reporting the problems with the [WWTP], his opposition to some of the proposals and projects advanced by the village, and his support for the work of the EPA."

{¶ 13} The village moved for summary judgment, arguing that Lee had reported only CYT's wrongdoing and did not identify any criminal violation involving the village. Lee countered that the village had committed two crimes. First, he cited R.C. 2927.24(B)(1), which prohibits knowingly placing a hazardous chemical into a public water supply. Second, he pointed to R.C. 6111.04(C), which prohibits a permit holder such as the WWTP from discharging higher levels of sewage than those specified in the permit.

{¶ 14} The trial court granted summary judgment in favor of the village on the statutory claim relevant to this appeal. The court determined that Lee was

4

not entitled to whistleblower protection because he did not report any criminal act of an environmental nature, only equipment failures caused by CYT's illegal discharge.

{¶ 15} The court of appeals reversed, finding a genuine issue of material fact to exist as to whether Lee engaged in whistleblowing under R.C. 4113.52(A)(1) and (2). 5th Dist. Morrow No. 12CA0017, 2013-Ohio-3108.

{¶ 16} We accepted the village's appeal. 137 Ohio St.3d 1440, 2013-Ohio-5678, 999 N.E.2d 695.

## Analysis

{¶ 17} R.C. 4113.52(D) provides a cause of action to any employee who suffers disciplinary or retaliatory action "as a result of * * * having filed a report under division (A)" of R.C. 4113.52. The question here is whether Lee qualified for protection under R.C. 4113.52(A)(1) or (2), which identify two forms of whistleblowing. An employee must "strictly comply" with the reporting requirements to obtain whistleblower protection. *Contreras v. Ferro Corp.*, 73 Ohio St.3d 244, 652 N.E.2d 940 (1995), syllabus.

### *The Alleged Whistleblowing*

{¶ 18} We begin by underscoring that Lee seeks whistleblower protection based on the concerns he expressed regarding the village, not CYT.[1] As he did in his memorandum opposing summary judgment, Lee argues that the village was not only a victim of CYT's illegal glycol discharge, but was the perpetrator of its own crimes, given its failure to repair the damage the glycol had caused to the WWTP. First, Lee cites R.C. 6111.04(C), which prohibits a permit holder from discharging sewage at levels exceeding those in the permit. He explains that by not repairing the equipment damage, the village was at risk of violating the

---

[1] Lee's complaint filed in common pleas court was less than clear on this point. It alleged only that the village retaliated against Lee for "reporting the problems with" the WWTP. Lee did not explain how these "problems" constituted any of the criminal violations covered by R.C. 4113.52(A)(1) or (2) until he filed his memorandum opposing summary judgment.

discharge limitations in its operating permit. Second, Lee makes a conclusory reference to R.C. 2927.24(B)(1), which prohibits a person from knowingly placing a hazardous chemical into a public water supply. Lee maintains that although CYT was the source of the pollutant, the village was knowingly placing the pollutant into the water supply.

*Lee Did Not Strictly Comply with R.C. 4113.52(A)(1) or (2)*

{¶ 19} Nevertheless, what Lee claims to have reported is demonstrably different from what he actually reported. Even viewing the evidence in his favor for purposes of summary judgment, *see Bostic v. Connor*, 37 Ohio St.3d 144, 146, 524 N.E.2d 881 (1988), the evidence shows only that Lee helped expose CYT's illegal discharge, not that he also reported crimes involving the village or that he did so in strict compliance with R.C. 4113.52(A)(1) or (2).

*R.C. 4113.52(A)(1)*

{¶ 20} R.C. 4113.52(A)(1) applies when an employee "becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision." R.C. 4113.52(A)(1)(a). The violation must be one that the "employer has authority to correct" and that the "employee reasonably believes * * * is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution." *Id*.

{¶ 21} To report a violation, the employee must start with his or her employer. The employee must orally report the violation to his or her supervisor or other responsible officer and "subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation." *Id*. If the employer does not correct or make a good faith effort to correct the violation within 24 hours, the employee may then notify outside authorities. *Id*.

**{¶ 22}** Lee did not satisfy the statute's written-report requirement. There is no written report in the record, only Lee's own recollection of a "supervisor's report" that he gave to Ralley in 2009. As described in Lee's deposition and affidavit, the report identified the "equipment failures" that resulted from CYT's illegal discharge over the years. The report identified the repairs that Lee believed would be necessary "to keep the village operating within the parameters of its permit which would prevent EPA violations." Lee prepared the report at the suggestion of a U.S. EPA official, who thought that village council could use it as a "tool to seek reimbursement from CYT."

**{¶ 23}** Lee's report of "equipment failures" does not qualify as a report that sufficiently identifies and describes any crimes involving the village, as the statute requires. Although Lee may have identified ways to "prevent" the WWTP from committing a permit violation under R.C. 6111.04(C), he knew that the WWTP had not yet committed such a violation. In his deposition, Lee admitted that the WWTP had never lost its permit during his employment, and he repeatedly told the village council that the WWTP continued to meet its permit obligations.

**{¶ 24}** Likewise, Lee's written report did not reveal that the village was knowingly placing glycol into the water supply. *See* R.C. 2927.24(B)(1). By the time of his report, it was well known that CYT was the source of the glycol, and Ohio EPA and U.S. EPA had definitively ruled out the WWTP as the source. Further, Lee admitted that he had never prepared a written report expressing his concerns about glycol—"only talk."

**{¶ 25}** In addition to being too little, Lee's written report was too late. R.C. 4113.52(A)(1)(a) requires the employee to file the report *before* notifying outside authorities. This affords the employer an "opportunity to correct the violation." *Contreras*, 73 Ohio St.3d at 248, 652 N.E.2d 940. Here, Lee did not give his written report to Ralley until 2009, after years of discussing the

equipment failures with EPA officials. In this regard, Lee's report is no different from the one in *Contreras*, in which we found the report to be deficient because the employee provided it "well after the matters had been revealed to a number of sources outside" the employer. *Id*. at 249.

{¶ 26} Even after viewing the evidence in Lee's favor for purposes of summary judgment, we conclude that it does not show that Lee strictly complied with the reporting procedure in R.C. 4113.52(A)(1).

*R.C. 4113.52(A)(2)*

{¶ 27} We now turn to whether the concerns Lee voiced about the WWTP constituted environmental whistleblowing under R.C. 4113.52(A)(2). An employee qualifies for protection under that statute only after (1) discovering a criminal violation of R.C. Chapter 3704, 3734, 6109, or 6111 and (2) providing oral or written notification to "any appropriate public official or agency that has regulatory authority over the employer and the industry, trade, or business in which the employer is engaged." R.C. 4113.52(A)(2).

{¶ 28} Although Lee was in constant contact with EPA officials at the state and federal level, there is no evidence that Lee notified them about any crimes perpetrated by the village. Lee worked with the authorities to expose the illegal discharge from CYT and then to repair the damage the discharge caused to the WWTP. As Lee put it in his deposition, "we were trying to resolve a problem that we were being stymied with."

{¶ 29} Lee repeats his argument that he reported a permit violation under R.C. 6111.04(C). But again, both Lee and Ohio EPA knew that the WWTP was continuing to satisfy the conditions of its permit. Lee also knew that the village was working to repair the problems at the WWTP, both by seeking restitution from CYT and by considering proposals from an outside engineering firm. Even assuming that Lee may have reported a permit violation to authorities, he lacked a "reasonable basis" to do so. R.C. 4113.52(C).

8

**{¶ 30}** As for Lee's claim that the village was knowingly discharging a hazardous pollutant in violation of R.C. 2927.24(B)(1), that statute is not among those qualifying for protection under R.C. 4113.52(A)(2).  In any event, Lee did not have any reasonable basis to believe that the WWTP was knowingly discharging glycol into the water.  Ohio EPA and U.S. EPA told him that the WWTP was not the source of the glycol.

**{¶ 31}** On this evidence, we conclude that Lee did not satisfy the procedural requirements of R.C. 4113.52(A)(1) or (2).  Therefore, he did not qualify for whistleblower protection.

### Conclusion

**{¶ 32}** Having concluded that Lee did not qualify for whistleblower protection, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

Judgment reversed.

O'CONNOR, C.J., and O'DONNELL, LANZINGER, and KENNEDY, JJ., concur.
PFEIFER and O'NEILL, JJ., dissent.

_____

**PFEIFER, J., dissenting.**

**{¶ 33}** This case should be dismissed as improvidently allowed.  It is highly fact specific and does not involve an important or novel legal question, but rather the application of settled law.

**{¶ 34}** Barring a dismissal of this appeal, the better course is to allow the plaintiff to proceed with his case.  It is possible that the water discharged after treatment by the village of Cardington's wastewater treatment plant contains levels of chemicals and compounds that are not permitted.  As the court of appeals noted, in that situation, "the Village is violating the law."  5th Dist. Morrow No. 12CA0017, 2013-Ohio-3108, ¶ 24.  Further proceedings are necessary in order to determine whether Donald Lee is able to prove his case

given all of the facts. There are insufficient grounds to support the majority's conclusion that the village is entitled to summary judgment.

**{¶ 35}** Instead of reversing, I would dismiss the appeal or would affirm the judgment of the court of appeals. I dissent.

O'NEILL, J., concurs in the foregoing opinion.

_____

Newhouse, Prophater, Letcher & Moots, L.L.C., Michael S. Kolman, and D. Wesley Newhouse, for appellee.

O'Toole, McLaughlin, Dooley & Pecora Co., L.P.A., and John D. Latchney, for appellant.

Trent A. Dougherty, urging affirmance for amicus curiae Ohio Environmental Council.

Valore & Gordillo, L.L.P., and Gregory A. Gordillo; and The Gittes Law Group and Frederick M. Gittes, urging affirmance for amicus curiae Ohio Employment Lawyers Association.

_____