## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 09 2015, 5:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Jerry T. Drook
Marion, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert L. Woods,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 9, 2015

Court of Appeals Case No. 27A05-1502-CR-61

Appeal from the Grant Superior Court

The Honorable Dana J. Kenworthy, Judge

Trial Court Cause No. 27D02-1405-FA-9

**Kirsch, Judge.**

Following a jury trial, Robert L. Woods was convicted of two counts of Class A felony child molesting.[1] He raises five issues, which we consolidate and restate as:

> I. Whether the trial court erred when it admitted into evidence the nurse examiner's diagram of the female sex organ, which showed where the victim had been touched by Woods, and permitted the nurse examiner to testify that the victim's statements to her demonstrated penetration;
>
> II. Whether testimony of the investigating detective constituted impermissible vouching;
>
> III. Whether the State's evidence was sufficient to convict Woods of Class A felony child molesting by sexual intercourse; and
>
> IV. Whether Woods's one-hundred-year sentence is inappropriate.

We affirm.

## Facts and Procedural History

One night in late March or early April 2014, eleven-year-old K.A.D. was at home, along with her brother, a cousin, and Woods, who was her step-father. Her mother ("Mother") was playing late night bingo at another location. Near

---

[1] *See* Ind. Code § 35-42-4-3(a)(1). We note that, effective July 1, 2014, a new version of the child molesting statute was enacted and that Class A felony child molesting is now a Level 1 felony. Because Woods committed his offenses before July 1, 2014, we will apply the statute in effect at that time.

midnight, K.A.D. came out of her room and asked Woods if she could watch television. Woods said yes and told her she could lie down on the couch, which she did. K.A.D.'s brother and cousin were asleep in her brother's bedroom.

[4] Woods got on the couch next to K.A.D., lying behind her. Woods then turned K.A.D. onto her back, and he got on his knees and hunched over her. Woods moved K.A.D.'s pajamas pants and underwear down to her knees and "started doing something" "to himself" and then he "started rubbing his private on [hers]" in a "rough" manner. *Tr.* at 41-42. He rubbed his penis where she would "wipe" when she would "pee." Id. at 42. He told her not to tell Mother or her brother because that would make them sad. Approximately a couple of weeks later, K.A.D. was sick and throwing up and Woods purchased a pregnancy test and told K.A.D. to take it. Woods thought she dipped it in water, so he purchased a second one at Family Dollar, as she waited in the car, and directed her to use it, which she did.

[5] Thereafter, on April 29, 2014, Woods woke up K.A.D. for school around 6:00 a.m. Mother and K.A.D.'s brother were home, each in their respective bedrooms. Not wanting to go to school, K.A.D. went to the living room couch and lay down. Woods proceeded to lay down next to her. Again, K.A.D. was, initially, on her side, but Woods flipped her onto her back. He took off her pajama pants and threw them on the floor, and he pulled down her underwear to her knees. He did something to himself, and hunched over her, with a blanket draped over him. Wood started "rubbing his private on [her] private."

*Id*. at 46. He rubbed his penis in the same area of her private part as he had on the prior occasion, namely where K.A.D. would "wipe." *Id*. at 47.

[6] While Woods was doing this, Mother entered the room and saw Woods, under a blanket, but "on all fours" above K.A.D. "moving his hand up and down . . . by his waist area." *Id*. at 90. Mother yelled and cussed at Woods. Mother went to her room, and Woods followed her, explaining that he was just tickling K.A.D. to wake her for school. K.A.D. also went into the bedroom and, when her Mother asked what happened, K.A.D. told her. K.A.D. thereafter got dressed and went to school that day.[2] Later that evening, Mother took K.A.D. to the Marion General Hospital ("Hospital"), arriving around 10:00 p.m.

[7] Detective Brian Sharp ("Detective Sharp") of the Marion Police Department was dispatched to the Hospital. Because the Hospital did not have a pediatric Sexual Assault Nurse Examiner ("SANE"), the plan was to send K.A.D. to the Fort Wayne Sexual Assault Treatment Center ("Fort Wayne Center") to be examined. Detective Sharp spoke briefly to K.A.D. to explain to her that she was going to the Fort Wayne Center for an examination, and before leaving for Fort Wayne, K.A.D. and Mother accompanied Detective Sharp to their home, where he took pictures of the home's interior, and he collected K.A.D.'s underwear and shirt as evidence. K.A.D. and Mother arrived at the Fort Wayne Center around 3:15 a.m., and K.A.D. met with SANE Joyce Moss

---

[2] K.A.D. did not shower or bathe before school that day. *Tr*. at 75.

("Moss") for an examination. K.A.D. told Moss about the morning's incident with Woods, and Moss took notes as K.A.D. provided the information of what happened with Woods.

[8] Later that morning, around 11:00 a.m., K.A.D. met with Detective Sharp at the First Light Child Advocacy Center ("the CAC"), to be interviewed at a "neutral," "child-friendly" environment. *Id*. at 259. K.A.D. was interviewed by Kelly Scott ("Scott") of the Indiana Department of Child Services, while a multi-disciplinary team, including Detective Sharp, a representative of the CAC, and a representative from the prosecutor's office observed on a television monitor in another room.

[9] On April 30, 2014, Woods met with Detective Sharp and Officer David Bennett for questioning during a videotaped interview. Woods denied that the two incidents on the couch occurred at all, maintaining that he did not touch K.A.D. He also denied that he required K.A.D. to take a pregnancy test, and he denied buying a pregnancy test. "Why would I make a child take a pregnancy [test] if nothing never happened and therefore if it did happen I never penetrated or to go inside of her for her to take a pregnancy test. It don't make sense." *Ex. Vol*. at 40 (State's Ex. 22T). Detective Sharp took a buccal swab DNA sample from Woods.

[10] On May 7, 2014, the State charged Woods with three counts of Class A felony child molesting; counts I and II alleged child molesting by sexual intercourse

with K.A.D., and count III alleged Woods committed criminal deviate conduct by penetrating K.A.D. with his finger.

[11] At the jury trial, K.A.D. testified to the two incidents where Woods had rubbed his penis on her while she was on the couch at home. When describing specifically on her body where Woods's penis touched her body, K.A.D. described that it was the location where she would wipe after urinating. K.A.D. testified that, during the first incident, she told Woods to stop and he replied, "Relax." *Tr.* at 42. She pushed Woods off of her, and "he smiled and then gave [her] a high five." *Id.* at 43. K.A.D. started crying and Woods said, "[S]top crying" and told K.A.D. go and change her underwear. K.A.D. changed her underwear and began to read a book in her room. Woods came into her room and asked K.A.D. "if [she] knew what that was called," and when she replied that she did not, he said, "[T]hat was called molestation." *Id.* 43, 45. K.A.D. testified about meeting with Moss, stating that she told Moss of the exact locations where the touching occurred and that she also showed Moss by using her own hands to point to locations on her body.

[12] K.A.D. also testified that, sometime between the first and second incidents involving Woods, she was ill and threw up "like five times" in one day. *Id.* at 61. Woods gave her "a stick for her to pee on." *Id.* Woods suspected that she did not urinate on the first one, so he went to Family Dollar store and purchased a second one; K.A.D. accompanied him but waited in the car while he went inside. When she got home, she told Woods that she "didn't want to" use it, but Woods told her, "Just do it so I can make sure you're okay." *Id.* at

63. K.A.D. testified that she did not tell Mother or her brother about the two incidents when Woods had touched her because she did not want them to be sad, and she expected they would be because they loved Woods. K.A.D. stated that she too loved Woods "[b]efore these things happened." *Id*. at 64.

[13] On cross-examination, counsel for Woods asked K.A.D. about the first incident, inquiring, "Did he put his penis in you at that time?" and she replied, "No." *Id*. at 65. She gave the same response when asked, "Did he put a finger in you at that time?" *Id*. Counsel for Woods then asked whether Woods "put anything inside the outer lips of your vagina." *Id*. She replied, "What do you mean?" Woods's counsel repeated the question, and she replied, "No." *Id*. at 65-66. Counsel for Woods then asked about the second incident on the couch, asking "Did he insert anything in the outer lips of your [] vagina?" and K.A.D. responded, "No." *Id*. at 66. Counsel further inquired, "So he didn't spread them and put anything in there?" to which K.A.D. answered, "I still don't understand," but later said, "Yeah, he did not put anything in me." *Id*.

[14] Mother, who at the time of trial was no longer married to Woods, testified that although she and Woods married in 2010, they had been together in a relationship since before K.A.D. was born. Thus, K.A.D. had known Woods her entire life and referred to him as "dad." *Id*. at 83. Mother described what she saw on April 29, 2014, when she woke up and walked into the living room and saw Woods on top of K.A.D. She said that after she cussed, Woods dropped on top of K.A.D. "and was like tickling her, like as to wake her up for school." *Id*. at 92. Mother explained that she "retreated" to her room "'cause I

was going to shoot him to be honest." *Id*. at 92-93. Woods followed Mother to her room and "was trying to explain hisself[,]" stating that nothing was going on and he was just trying to tickle K.A.D. and wake her up for school. *Id*. at 92. This did not match what K.A.D. told Mother had happened. Mother spent the day talking to family members and attempting to "deal[] with it." *Id*. at 95. That evening she and K.A.D. went to the Hospital, but were then sent to Fort Wayne. Woods was contacting Mother by text messaging throughout the day and while they were at the Hospital and at the Fort Wayne Center. Photographs of the text message communications between Woods and Mother were admitted at trial, some over Woods's objection. Woods texted Mother that it was "a big misunderstanding," and told her, "Let me know what the police saying." *Id*. at 106, 109; *Ex. Vol*. at 11, 15 (State's Ex. 8 and 13).

[15]  Ralph Seitz ("Seitz"), a loss prevention manager for Family Dollar, testified that on May 7, 2014, he received a request from Detective Sharp asking whether Family Dollar store's surveillance video showed that one or more pregnancy tests had been purchased at a specific Family Doller location on April 9, 2014 by a male with a physical description matching that of Woods. Seitz explained that the company maintains an electronic journal, by which he could search the surveillance footage for a particular product, using its SKU product number. On May 8, Seitz provided a DVD of footage that matched Detective Sharp's request. During Detective Sharp's trial testimony, he identified the man in the video purchasing a pregnancy test as Woods. That video was admitted without objection at trial and played for the jury. *Id*. at 293;

*Ex. Vol.* at 23 (State's Ex. 21). Still photographs taken from the video footage were also admitted, without objection, which showed Woods purchasing the item at the cash register.

[16] SANE Moss testified that she met with and performed an examination of K.A.D. around 3:15 a.m. on April 30, 2014. Moss testified that the exam was conducted in a typical medical clinic examination room, with things such as an exam table, lights, medical equipment, bandages, and the like, and K.A.D. wore a medical gown and Moss wore scrubs. Moss and K.A.D. were the only two individuals in the room, while Mother waited in the lobby. Moss testified about her examination of K.A.D., stating that, initially, K.A.D. told her what had happened and where Woods had touched her. In addition to telling Moss, K.A.D. showed Moss where Woods had touched her by using her own hand to point to areas of her anatomy.[3] Moss documented what K.A.D. told and showed her by writing the information in her chart, which was admitted without objection. *Tr.* at 187; *Ex. Vol.* at 57-66 (State's Ex. 26). K.A.D. told Moss that Woods "rubbed his weiner on my privates on the inside where I wipe." *Ex. Vol.* at 61.

[17] Moss continued her testimony by explaining for the jury the anatomy of the female sex organ, drawing a diagram as she spoke and identifying the differences between the external female sex organ and the internal female sex

---

[3] Moss testified that K.A.D.'s statements to her did not indicate that ejaculation had occurred.

organ. Moss explained that the internal female sex organ includes the labia minora, clitoral hood, clitoris, urethra, and hymen. At the State's request, Moss marked on the diagram the locations that K.A.D. had indicated had been touched by Woods. Moss marked the labia majora, labia minora, clitoral hood, urethra, and hymen. Over Woods's objection, the diagram was admitted into evidence. K.A.D. told Moss that on one or more occasions during that day she had urinated and wiped. Moss's chart and documentation from the exam were admitted without objection. Moss collected physical evidence during the examination, including K.A.D.'s pajama pants that she had worn the prior morning when Woods was on the couch with her. Moss also took DNA swabs from K.A.D., including her vagina, buttocks, inner thighs, pubic combing, and face/cheek/lips. At the conclusion of Moss's testimony, jurors presented additional questions for Moss, which the trial court reviewed with counsel. Following a bench conference, and over Woods's objection, the trial court asked, "Did K.A.D.'s description of what happened include penetration of the female sex organ?" and Moss replied, "Yes." *Id.* at 196; *Ex. Vol.* at 98.

[18] During Detective Sharp's testimony, he identified and testified about certain pictures that he took at K.A.D.'s residence on April 29, explaining that some of the pictures represented Mother's point of view when she first observed Woods on the couch over K.A.D., and another photograph captured her view of the couch as she stepped closer, before she turned and left the room. Detective Sharp also testified that K.A.D.'s statements in the CAC interview, which he had observed, were consistent with K.A.D.'s trial testimony. Thereafter, over

Wood's objection, Detective Sharp testified that Moss's trial testimony, describing what K.A.D. had told her, was consistent with that which K.A.D. told Scott at the CAC.

[19] Detective Sharp's April 30, 2014 videotaped interview with Woods at the police station was admitted into evidence and played for the jury. In addition, Detective Sharp testified that he monitored and listened to phone calls that Woods made while he was jailed at the Grant County Jail. Recordings of calls on July 22, 2014, November 9, 2014, and December 4, 2014 were admitted into evidence and played for the jury. In one phone call, Woods made statements to Mother acknowledging that he "did something wrong" that he "screwed up royally." *Ex. Vol.* 54 (State's Ex. 23, Jail Phone Call 7/23/14). He also expressed that he wanted K.A.D. "to understand how sorry I am." *Id.* He hoped K.A.D. would know that "the man she grew up around was not like that." *Id.* In a November 9, 2014 phone call to Mother, Woods stated that he was sorry, he considered K.A.D. to be his daughter, and he hoped he could "repair" the damage to his relationship with her. *Id.* (State's Ex. 23, Jail Phone Call 11/9/14). He expressed, "I don't know what the f*ck went wrong in my head to make me do that sh*t." *Id.* He told Mother, "I'm a broken f*cking mess." *Id.*

[20] Melissa Meyers ("Meyers") a forensic biologist and DNA analyst with the Indiana State Police Crime Lab ("Lab") testified regarding the Lab's DNA testing on evidence submitted in connection with Woods's case. Meyers stated that she conducted YSTR DNA analysis, which she explained is a type of DNA

testing that removes any female DNA on the sample being tested and is intended to look for DNA that is found on the Y chromosome, "so it's looking specifically at male DNA." *Tr*. at 211. Meyers testified that she tested ten items that had been provided to the Lab, including a cutting from K.A.D.'s underwear, a vaginal swab, an internal female sex organ swab, pubic hair combing, face/cheek/lip swab. Meyers testified that nine items failed to demonstrate a sufficient quantity of male DNA to continue with her YSTR analysis, meaning there was not enough male DNA to be detected. Meyers obtained a YSTR result only from the face/cheek/lip swab. That testing demonstrated the presence of "a mixture with a major profile," and the YSTR profile was consistent with Woods, such that Woods and his male paternal relatives could not be excluded as potential YSTR contributors to that sample. *Id*. at 217. At the State's questioning, Meyers also described the concept of "touch DNA," where DNA can be transferred from handling or touching an item. *Id*. at 220. She testified that wiping after urination could affect the likelihood of finding touch DNA on that location.

[21] The trial court's final instructions included Instruction 14.189, which stated: "The term 'sexual intercourse' is defined by law as meaning an act that includes any penetration of the female sex organ by the male sex organ." *Appellant's App*. at 80. The next instruction read:

> Indiana law does not require that the vagina be penetrated for
> sexual intercourse or deviate sexual conduct to occur. Proof of
> the slightest degree of penetration of the external features of the
> female sex organ by the male sex organ or an object is sufficient

to establish sexual intercourse or deviate sexual conduct if all other elements are proved beyond a reasonable doubt. The mere contact with male and female sex organs is not by itself sufficient evidence of penetration.

*Id.*

[22] The jury found Woods guilty of Counts I and II, Class A felony child molesting by sexual intercourse, and it found him not guilty of Count III, Class A felony child molesting by committing sexual deviate misconduct by the act of penetration of her vagina with his finger. The trial court identified as aggravators Woods's criminal history and his violation of a position of trust, as Woods had been K.A.D.'s stepfather for her entire life. The trial court found no mitigators and sentenced Woods to two fifty-year sentences, to be served consecutively. Woods now appeals.

## Discussion and Decision

[23] On appeal, Woods claims that SANE Moss's diagram of the female sex organ should have been excluded as hearsay evidence and that her answer to the juror question – that K.A.D.'s description demonstrated penetration – constituted witness testimony on a legal conclusion as prohibited by Indiana Evidence Rule 704(b). He also asserts that certain portions of Detective Sharp's testimony constituted impermissible vouching. Woods next argues that the evidence was insufficient to convict him of Class A felony child molesting, especially without the challenged evidence of Moss and Detective Sharp. More specifically, he claims that there was insufficient evidence of penetration such that he could be

convicted of child molesting by sexual intercourse, and the evidence was sufficient to convict him only of Class C felony child molesting. *See Appellant's Br.* at 34 (conceding he was guilty of Class C felony child molesting by touching or fondling). Woods also contends that his one-hundred-year sentence is inappropriate. With that backdrop, we address Woods's issues in turn.

## I. Admissibility of Evidence

A trial court has broad discretion in ruling on the admission or exclusion of evidence. *Palilonis v. State*, 970 N.E.2d 713, 726 (Ind. Ct. App. 2012), *trans. denied*. The trial court's ruling on the admissibility of evidence will be disturbed on review only upon a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id.*

### A. Moss's Diagram of the Female Sex Organ

Woods argues it was error to admit into evidence SANE Moss's diagram of the female sex organ, which Moss drew as she testified during trial. At trial, Woods's counsel objected on the basis that it should be admitted for "demonstrative purposes only." *Tr.* at 169. The trial court overruled the objection and admitted the diagram "as substantive evidence." *Id.* at 170. On appeal, Woods asserts that the diagram was inadmissible hearsay evidence "in written/diagram form" and that counsel should have objected on this basis. *Appellant's Br.* at 25. A party may not object to the admission of evidence on

one ground at trial and seek reversal on appeal based on a different ground. *Boatner v. State*, 934 N.E.2d 184, 187 (Ind. Ct. App. 2010). To avoid waiver of the issue, Woods claims it was fundamental error for the trial court to admit the diagram. The fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Palilonis*, 970 N.E.2d at 730 (citing *Brown v. State,* 929 N.E.2d 204, 207 (Ind. 2010). The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. *Id.* This exception is available only in egregious circumstances. *Id.*

[26] A hearsay statement is one "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evid. R. 801(c). Hearsay statements are not admissible, except pursuant to certain exceptions within the Rules of Evidence. Ind. Evid. R. 802. One such exception is found in Rule 803(4), which states that the following are not excluded by the hearsay rule, regardless of whether the declarant is available as a witness:

> Statements made by persons who are seeking medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Ind. Evid. R. 803(4).

[27] The exception is grounded in the premise that people are unlikely to lie to their doctors because doing so might jeopardize their opportunity to be made well. *VanPatten v. State,* 986 N.E.2d 255, 257 (Ind. 2013). There is a two-step analysis for determining whether a statement is properly admitted under Rule 803(4): (1) whether the declarant is motivated to provide truthful information in order to promote diagnosis and treatment; and (2) whether the content of the statement is such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment. *Palilonis*, 970 N.E.2d at 726 (quotations omitted). With regard to the first inquiry, in the case of a child declarant, there must be evidence that the child understood the professional's role. *VanPatten*, 986 N.E.2d at 261. As to the second step of the analysis, "Statements made by victims of sexual assault or molestation about the nature of the assault or abuse . . . generally satisfy the second [step] of the analysis because they assist medical providers in recommending potential treatment for sexually transmitted disease, pregnancy testing, psychological counseling, and discharge instructions." *Id.* at 260.

[28] Woods suggests that the statements made by K.A.D. to Moss were not for the purpose of diagnosis or treatment, arguing that "[K.A.D.] had already been seen at the emergency room in Marion before going to Fort Wayne. There was no[] injury or pain or trauma being treated[.]" *Appellant's Br.* at 26. Therefore, Woods asserts, the purpose of her visit to the Fort Wayne Center was to be

"interviewed for purposes of collecting evidence for trial" and "[K.A.D.'s] statements to the nurse were testimonial."[4] *Id.* We disagree.

[29] Here, contrary to Wood's assertion that she had "already been seen at the emergency room," K.A.D. was not examined by a doctor or nurse while at the Hospital. *Id.* Instead, K.A.D. was sent to the Fort Wayne Center because the Hospital did not have a pediatric SANE nurse on staff. At the Fort Wayne Center, K.A.D. and Mother met Moss in the lobby, where Mother provided K.A.D.'s medical history. Moss then met privately with K.A.D. in the examination room, which was a typical medical clinic room. Moss wore scrubs and K.A.D. wore a medical gown. Moss took K.A.D.'s vital signs and she then conducted an examination of K.A.D. Moss's notes in her chart indicate that K.A.D. expressed her understanding of the fact that Moss was a nurse and that K.A.D. was at the Fort Wayne Center for an examination. When Moss asked K.A.D. if she knew what doctors and nurses do, K.A.D. replied, "[T]hey make sure you're healthy." *Ex. Vol.* at 61. We are satisfied that the evidence demonstrated the foundational requirement that K.A.D., who was eleven years

---

[4] We note that Woods generally asserts that the admission of K.A.D.'s statements to Moss, as reflected in Moss's diagram, were testimonial, and he was denied his right to confront K.A.D. about the diagram. *Appellant's Br.* at 25 ("The child never saw this diagram . . . nor was Woods given the opportunity to cross examine [K.A.D.]" as to the accuracy of it). He thus appears to make a claim that its admission was a violation of the Sixth Amendment's Confrontation Clause. Woods does not, however, make any Sixth Amendment claim in his brief nor cite to authority, instead primarily opposing the diagram's admission on hearsay grounds. Accordingly, our analysis is likewise directed to the appropriateness of its admission under Indiana's Rules of Evidence.

old at the time, understood Moss's professional role as a nurse who would be examining K.A.D. in furtherance of diagnosis or treatment.

[30]     K.A.D. shared with Moss her patient history and described what had happened with Woods. K.A.D. made statements, describing how and where Woods touched her, so that Moss would know how to proceed in treating K.A.D. On appeal, Woods claims that K.A.D.'s statements to Moss about where Woods touched her were not consistent with her trial testimony: "[S]he said nothing of the sort herself while she was on the stand and subject to cross examination." *Appellant's Br.* at 25. We disagree. Moss's testimony, while more specific than K.A.D.'s testimony, was not inconsistent with it. K.A.D. testified that Woods's penis touched her where she would "wipe," which matched the areas marked by Moss on the diagram. *Tr.* at 42, 47. As K.A.D. told and showed Moss during the examination where Woods touched her, Moss recorded it, using anatomical terms, in the medical chart. K.A.D., who was twelve years old at the time of trial, could not be expected to name specific parts of the female sex organ. Indeed, our courts have recognized that in child molestation cases "a detailed anatomical description by the victim is unnecessary and undesirable" because many people are unable to precisely describe anatomical features, particularly children who may have unfamiliarity with anatomical terms and possess a limited sexual vocabulary. *Wisneskey v. State*, 736 N.E.2d 763, 765-66 (Ind. Ct. App. 2000). Such a requirement would subject victims to unwarranted questioning and cross-examination. *Id.*

[31] K.A.D.'s statements to Moss during the examination were made so that Moss could assess her and determine the need for further medical and psychological care. We note that although Moss saw no physical trauma or injury, she observed two "raised wart-like structures" on K.A.D.'s labia. *Ex. Vol.* at 64-65. After the examination, Moss provided Mother with written and verbal instruction regarding the exam findings, counseling for K.A.D., and directions to follow up with a physician for medical evaluation, and if necessary, treatment of the wart-like growths. Based on the record before us, we find that Moss's drawing of the female sex organ, which reflected K.A.D.'s statements to Moss while receiving medical diagnosis and treatment, was properly admitted under Indiana Evidence Rule 803(4), and Woods was not denied a fair trial because of its admission.

### B. Moss's Statement Regarding Penetration

[32] Woods also argues that the trial court erred, and his trial lacked fundamental fairness, when it allowed Moss to testify that what K.A.D. described to her during the examination was penetration. More specifically, Juror #4 posed two questions, one of which was modified by the trial court to state as follows: "Did [K.A.D.'s] description of what happened include penetration of the female sex organ?" *Tr.* at 196; *Ex. Vol.* at 98. Woods objected to the question on the basis that it was improper because it constituted an ultimate fact to be decided by the jury. *Tr.* at 193, 196. Over Woods's objection, the trial court read the question to Moss, who replied, "Yes." *Id.* at 196. On appeal, Woods argues that allowing Moss to so testify "was nothing short of allowing [her] to voice her

legal conclusion that Woods had penetrated [K.A.D.] and therefore was guilty as charged," and this violated Indiana Rule of Evidence 704(b), which prohibits a witness from testifying as to a legal conclusion.[5] *Appellant's Br.* at 21. Woods argues that because Moss was a SANE nurse with extensive training, the jury likely credited her opinion with considerable weight, and thus there is "a substantial likelihood that this erroneously admitted evidence contributed to the conviction" and swayed the jury's verdict, such that Woods was denied fundamental due process. *Id.* at 24. The State maintains that Moss's response was a medical assessment that K.A.D.'s description of where she was touched reflected penetration of the female sex organ, and "she did not provide a legal conclusion." *Appellee's Br.* at 10.

[33] Moss's testimony that K.A.D. had described penetration of the female sex organ went to the ultimate issue, and, therefore, this testimony was inadmissible under Rule 704(b). *See Williams v. State*, No. 48S05-1507-CR-424, 2015 WL 6447736 at *3-4 (Ind. Oct. 26, 2015). Nevertheless, we find any error was harmless, given the record before us. As we have held, the erroneous admission of evidence will be disregarded unless it affects the substantial rights of a party. *Mastin v. State*, 966 N.E.2d 197, 201 (Ind. Ct. App. 2012) (citing *Hoglund v. State,* 962 N.E.2d 1230, 1238 (Ind. 2012)), *trans. denied*. Here, the State charged Woods with Class A felony child molesting by sexual intercourse.

---

[5] Indiana Evidence Rule 704(b) provides: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions."

The trial court instructed the jury that "sexual intercourse" was defined by law "as meaning an act that includes any penetration of the female sex organ by the male sex organ." *Ex. Vol.* at 110. It further instructed, in part:

> Indiana law does not require that the vagina be penetrated for sexual intercourse or deviate sexual conduct to occur. Proof of the slightest degree of penetration of the external features of the female sex organ by the male sex organ . . . is sufficient to establish sexual intercourse . . . if all other elements are proved beyond a reasonable doubt.

[34] *Id.* Although K.A.D. testified that Woods's penis did not go "inside" her or inside the outer lips of her vagina, she described that Woods's penis touched her in the area where she would "wipe" after urinating. *Tr.* at 42, 47, 65-66. Moss described for the jury the anatomy of the female sex organ and explained that the internal female sex organ includes the labia minora as well as the urethra, the structure through which urine is expelled. K.A.D., by pointing to her own body, showed Moss the exact locations where Woods's penis touched her, and Moss reflected that information in her report, which indicated that K.A.D. said that Woods rubbed his penis "on my privates *on the inside* where I wipe." *Ex. Vol.* at 61 (emphasis added). Moss also marked on the female sex organ diagram, which we have found was not erroneously admitted, that Woods's penis rubbed on structures of K.A.D.'s internal female sex organ. Even without Moss's answer to the jury question, the jury heard and saw where Woods's penis touched K.A.D. Given that record, we are not persuaded that Moss's "penetration" statement deprived Woods of a fair trial.

# II. Vouching

[35] Next, Woods asserts that the trial court committed evidentiary error by allowing Detective Sharp to testify about whether things that K.A.D. said to other people during the course of the investigation were consistent with what he heard K.A.D. and Moss state on the witness stand. At trial, Woods posed various objections during the line of questioning, including that the jury could make its own decision as to consistency and that Detective Sharp's testimony about K.A.D.'s statements was not the best evidence of what was said; the trial court overruled some objections, while for others it directed the State to rephrase its question. *Tr.* at 261-65. Eventually, Woods argued that Detective Sharp's testimony was hearsay, and the State agreed. No trial court admonishment or action was requested or occurred, but the line of questioning ended.

[36] On appeal, Woods claims that Detective Sharp was permitted to give vouching testimony. Apparently acknowledging that he did not object on that basis at trial, Woods claims that the admission of Detective Sharp's testimony regarding the consistency of the various out-of-court statements constitutes fundamental error. *See Appellant's Br.* at 32 (stating that although individual instances of vouching may not rise to fundamental error, "State's repeated acknowledged use of hearsay testimony . . . does get closer to the line [of] fundamental error"). As we have recognized, fundamental error is a very narrow exception and "is meant to correct only the most egregious of trial errors." *Bean v. State*, 15

N.E.3d 12, 22 (Ind. Ct. App. 2014) (citing *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *trans. denied*.

[37] Vouching testimony is specifically prohibited under Indiana Evidence Rule 704(b), which states: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." This testimony is considered an "invasion of the province of the jurors in determining what weight they should place upon a witness's testimony." *Bean*, 15 N.E.3d at 18 (citing *Kindred v. State,* 973 N.E.2d 1245, 1257 (Ind. Ct. App. 2012), *trans. denied*.) On appeal, Woods particularly challenges that Detective Sharp was permitted over his objection to testify that: (1) K.A.D.'s trial testimony was consistent with what he saw and heard K.A.D. say to Scott at the CAC; and (2) SANE Moss's trial testimony (in which she related what K.A.D. said to her during the examination) was consistent with what K.A.D. had said to Scott at the CAC. We examine each in turn.

[38] Detective Sharp was present at the CAC, and, from behind a mirror, he heard and saw K.A.D. make statements (about when and how Woods touched her) to Scott during the interview with K.A.D. At trial, the State asked Detective Sharp, "In hearing K.A.D.'s disclosure, was it largely consistent with what she told the jury here yesterday?" *Tr.* at 261. Detective Sharped responded, "Yes, it was." *Id.* As an initial matter, we note that Woods did not object to that question and answer. Furthermore, Detective Sharp did not testify that he believed K.A.D. or make any statements about the truth or falsity of the

allegations against Woods. Woods has failed to demonstrate that Detective Sharp's testimony constituted vouching and that its admission resulted in fundamental error.

[39] Woods argues that the next series of questions posed by the State to Detective Sharp was more "troubling." *Appellant's Br.* at 31. After inquiring about K.A.D.'s statement to Scott, the State asked Detective Sharp whether that same statement was consistent with SANE Moss's testimony, which related what K.A.D. had told her. Woods objected, arguing that Detective Sharp was not present at the Fort Wayne Center, and thus he did not observe K.A.D. make any statements there. The State agreed to rephrase:

> Q: You were present during Nurse Moss's testimony yesterday.
>
> A: Yes, I was.
>
> Q: You also reviewed her written record of what she said she wrote down as K.A.D. was telling her the history of what had happened to her.
>
> A: Yes.
>
> . . . .
>
> Q: Was that consistent with what K.A.D. told [Scott] at the CAC?

*Tr.* at 262. Woods again objected and argued that Detective Sharp was not present at the Fort Wayne Center, it was "irrelevant" whether Detective Sharp thought Moss's testimony was consistent with K.A.D.'s statement at the CAC,

and that the jury could make its own decision about the consistency between the testimony of the two witnesses. *Id.* The trial court overruled Woods's objection. *Id.* at 263. The State continued:

> Q: Was her disclosure at the CAC consistent with what Nurse Moss testified yesterday K.A.D. had told Nurse Moss earlier that morning?
>
> A: Yes

*Id.*

[40] To the extent that Woods contends that Detective Sharp's testimony is hearsay, we disagree, as he did not testify as to the statements made by another person. Rather, he testified as to the consistency between K.A.D.'s statement at the CAC and Nurse Moss's trial testimony that recounted what K.A.D. had told her. With regard to the claim that Detective Sharp's testimony constituted vouching, Woods appears to argue that that Detective Sharp's testimony was vouching for the "veracity and consistency" of Moss's testimony. *Appellant's Br.* at 32; *see also id.* at 32 ("This an attempt to lend credence to Nurse Moss's hearsay testimony[.]") Woods asserts that because Moss's testimony was "of critical importance to the State's case," the "instances of vouching for the consistency of [Moss's] rendition of what [K.A.D.] said to her" was prejudicial to Woods's substantial rights. *Id.* Upon review, we find no reversible error in the Detective's testimony. He did not testify that he believed K.A.D., and he did not testify that he believed Moss. He did not opine as to the truth of Moss's testimony or of K.A.D.'s. He testified to the consistency of K.A.D.'s statement

at the CAC to Moss's trial testimony. We do not find that this testimony constituted improper vouching.

[41]     While we question the relevancy of Detective Sharp's opinion as to consistency, we find that error, if any, in its admission was harmless. *See Owens v. State*, 659 N.E.2d 466, 477 (Ind. Ct. App. 1995) (investigating officer's testimony that witness's two prior statements were consistent was irrelevant "witness-bolstering," and State should have offered the prior statements and left it to jury to draw conclusions with respect to consistency of statements to witness's trial testimony, but error in admission did not prejudice defendant's substantial rights or require reversal). Errors in the admission of evidence are generally to be disregarded unless they affect the substantial rights of a party. *Hoglund*, 962 N.E.2d at 1238. Improper admission of evidence is harmless if the conviction is supported by substantial independent evidence of guilt that satisfies the reviewing court that there is no substantial likelihood that the challenged evidence contributed to the conviction. *Id*.

[42]     Here, the jury heard and saw K.A.D. testify that Woods touched her with his penis on two occasions, several weeks apart, and she described the manner in which Woods touched her and where on her body it occurred. The jury heard Moss's testimony about what K.A.D. had told and showed her during the examination as to the exact location on her body where Woods touched her. K.A.D. testified that Woods purchased a pregnancy test and required her to take it, which Woods denied in his police interview, and at trial the State presented the Family Dollar store surveillance footage of Woods purchasing a

pregnancy test there on April 9, 2014, which fits the time frame of the two acts of molestation. Given the record before us, we find no reversible error with regard to Detective Sharp's testimony.

## III. Sufficiency of the Evidence

[43] Woods next contends that there is insufficient evidence to support the child molesting by sexual intercourse convictions. More specifically, he denies that there was evidence of penetration.[6] Our standard of reviewing claims of sufficiency of the evidence is well settled: an appellate court neither judges the credibility of witnesses nor reweighs the evidence. *Stetler v. State*, 972 N.E.2d 404, 406 (Ind. Ct. App. 2012) (citing *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007)), *trans. denied*. We consider only the probative evidence and reasonable inferences supporting the verdict and consider conflicting evidence most favorable to the verdict. *Mastin,* 966 N.E.2d at 201-02. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* That is, the verdict will not be disturbed if there is sufficient evidence of probative value to support the conclusion of the trier of fact. *Stetler*, 972 N.E.2d at 406.

---

[6] During his interview with police in May 2014, Woods denied that he touched K.A.D., and he denied that he purchased a pregnancy test or required her to take one. However, during recorded subsequent jail phone calls and visits, Woods admitted to touching K.A.D. but maintained, "I just rubbed it." *Ex. Vol.* at 54 (jail call of November 7, 2014).

[44] To prove the Class A felony child molesting by sexual intercourse charges, the State was required to show that Woods, being at least twenty-one years old, performed sexual intercourse with K.A.D., a child under fourteen years of age. Ind. Code § 35-42-4-3(a). Sexual intercourse is "an act that includes any penetration of the female sex organ by the male sex organ." Ind. Code § 35-31.5-2-302. The statute defining sexual intercourse does not require that the vagina be penetrated, only that the female sex organ be penetrated. *Short v. State*, 564 N.E.2d 553, 559 (Ind. Ct. App. 1991); *see also Morales v. State*, 19 N.E.3d 292, 298 (Ind. Ct. App. 2014) (penetration of external genitalia, or vulva, is sufficient to support unlawful sexual intercourse conviction), *trans. denied*. To sustain a conviction for child molesting or incest, proof of the "slightest penetration" of the female sex organ by the male sex organ is sufficient. *Mastin*, 966 N.E.2d at 202 (citing *Dinger v. State*, 540 N.E.2d 39, 40 (Ind. 1989)). However, mere contact between a male and female sex organ is not by itself sufficient evidence of penetration. *Adcock v. State*, 22 N.E.3d 720, 728 (Ind. Ct. App. 2014) (citing *Spurlock v. State*, 675 N.E.2d 312, 315 (Ind. 1996)). Penetration can be inferred from circumstantial evidence. *Mastin*, 966 N.E.2d at 202 (citing *Pasco v. State*, 563 N.E.2d 587, 590 (Ind. 1990)).

[45] Woods argues that K.A.D. "consistently maintained she was never penetrated by Woods[.]" *Appellant's Br.* at 33. However, this statement misrepresents the evidence. Although K.A.D. stated, upon cross-examination, that Woods did not put his penis "inside" her, she also testified that on two occasions Woods rubbed his penis on her and she described the location of the rubbing as being

where she would "wipe" after urinating. *Tr.* at 42, 47, 65-66. K.A.D. told Moss the same thing, and she showed Moss by pointing to specific parts of her own anatomy. K.A.D. told Moss that Woods "rubbed his weiner on my privates on the inside where I wipe." *Ex. Vol.* at 61. Moss told the jury that the female sex organ includes the labia majora, labia minora, vulva, and urethra, which are the same anatomical structures where Woods's penis touched K.A.D. Given this evidence, the jury could have found that penetration, even the "slightest penetration," of the female sex organ by the male sex organ had occurred. *See Mastin*, 966 N.E.2d at 202.

[46] Furthermore, the State presented circumstantial evidence that sexual intercourse occurred during the first incident on the couch. K.A.D. testified that sometime between the first incident on the couch and the second incident, which happened about three weeks later, on April 29, 2014, Woods required her to "pee on a stick" and when he was not satisfied with the results of that test, he went to Family Dollar and purchased another test, as she waited in the car. *Tr.* at 61-62. In his police interview that was played for the jury, Woods denied both having purchased a pregnancy test and requiring K.A.D. to take one; however, the State introduced Family Dollar videotaped surveillance footage of Woods purchasing a pregnancy test on April 9, 2014. From this, it would have been reasonable for the jury to infer that Woods's suspected that K.A.D. was pregnant and that he was responsible for it.

[47] Our standard of review dictates that we will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a

reasonable doubt. *Mastin*, 966 N.E.2d 202. Based on the record before us, we find sufficient evidence was presented to convict Woods as charged. *See Stetler*, 972 N.E.2d at 408 (evidence of penetration sufficient to convict defendant of Class A felony child molesting where child victim described to nurse that defendant touched her on clitoral hood, which nurse explained was structure of female sex organ); *Mastin*, 966 N.E.2d at 202 (evidence of penetration of female sex organ sufficient where defendant admitted to rubbing child's vagina with his penis and nurse testified that child had redness on labia minora and areas of scarring on labia majora).

## IV. Appropriateness of Sentence

[48] Woods argues that his one-hundred-year sentence is inappropriate. Under Indiana Appellate Rule 7(B), we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. When considering whether a sentence is inappropriate, we must give due consideration to that decision. *Mastin*, 966 N.E.2d at 203. We also recognize the unique perspective a trial court brings to its sentencing decisions. *Id.* Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Stetler*, 972 N.E.2d at 408.

[49] Woods was sentenced to two consecutive fifty-year sentences for each Class A felony child molesting conviction, for an aggregate sentence of one hundred years. The sentencing range for a Class A felony is twenty to fifty years

imprisonment, with an advisory sentence of thirty years imprisonment. *See* Ind. Code § 35-50-2-4. In addition, because Woods was convicted of child molesting involving sexual intercourse with a victim less than twelve years of age, he is classified as a credit restricted felon, earning one day of credit time for every six days that he is imprisoned. Ind. Code §§ 35-31.5-2-72, 35-50-6-3; *Tr.* at 355.

[50] Woods asserts that the sentence was inappropriate based on the nature of the offense. Initially, we remind Woods that he bears the burden of establishing that his sentence is inappropriate in light of *both* the nature of the offenses and his character. *See Anderson v. State*, 989 N.E.2d 823, 827 (Ind. Ct. App. 2013) (appellant bears burden of showing both prongs of inquiry favor revision of sentence), *trans. denied*. Woods argues on appeal only the "nature of the offense" prong and not the "character" prong. He has therefore waived any "character" argument. *See id*. Waiver notwithstanding, Woods's argument fails.

[51] Concerning Woods's character, we observe that Woods possessed a lengthy criminal history of at least ten felony convictions and eleven misdemeanor convictions, extending from 1996 to the present offenses. The history includes drug offenses and crimes of violence such as battery, domestic battery, and strangulation. Woods had violated his probation at least thirteen times, and he was on probation under two separate cause numbers at the time of the current offenses. The trial court characterized Woods's criminal history as both "lengthy" and "serious." *Tr.* at 353. The trial court also recognized that certain

evidence, namely conversations that transpired during one or more jail phone calls between Woods and Mother, who by then was his ex-wife, "spoke volumes to . . . the character of this defendant." *Id*. at 354. The trial court observed that, in the calls, Woods "degrad[ed]" her and "the amount of control that he still to this day tries to exert over [Mother] after she's done right by her daughter" was "incredible." *Id*. at 354-55. We find that Woods's character does not indicate that a revision in his sentence is warranted.

[52] On appeal, Woods urges us to find that that the nature of the offenses "does not merit maximum consecutive sentences." *Appellant's Br*. at 35. He highlights that the conduct occurred on two isolated occasions, occurring approximately three weeks apart, with no physical injury or pain to the victim. The State, in turn, argues that Woods, who was K.A.D.'s stepfather for her entire life, molested her on two occasions, when she was eleven years old, violating their bond and he trust. At sentencing, the trial court commented that although Woods was K.A.D.'s stepfather, "Woods was the primary father that she had known throughout her life and clearly she was attached to him, bonded to him, looked up to him[.] . . . She was emotionally damaged. That was demonstrated throughout her testimony as she cried, as she talked about what happened to her in this case." *Tr*. at 354. He violated a position of trust and, after the first incident, he intimidated her into not disclosing what he had done by telling K.A.D. that her mother and brother would be sad. The trial court observed that Woods "had ample time between [the two] offenses to conform [] his behavior to the confines of the law." *Id*. at 355. Woods did not do so.

The sentencing question before us is not whether another sentence would be more appropriate; rather, the inquiry is whether the sentence imposed is inappropriate. *Williams v. State*, 997 N.E.2d 1154, 1165 (Ind. Ct. App. 2013). Based on Woods's character and the nature of the offense, we cannot say that the sentence was inappropriate.

Affirmed.

Najam, J., and Barnes, J., concur.